# PASQUANTINO ET AL. v. UNITED STATES

No. 03–725.   Argued November 9, 2004—Decided April 26, 2005

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, and KENNEDY, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which BREYER, J., joined, and in which SCALIA and SOUTER, JJ., joined as to Parts II and III, *post*, p. 372.

*Laura W. Brill* argued the cause for petitioners. With her on the briefs were *Bruce R. Bryan* and *Jensen E. Barber.*

*Deputy Solicitor General Dreeben* argued the cause for the United States. With him on the brief were *Acting Solicitor General Clement, Assistant Attorney General Wray, Irving L. Gornstein,* and *Kirby A. Heller.**

JUSTICE THOMAS delivered the opinion of the Court.

At common law, the revenue rule generally barred courts from enforcing the tax laws of foreign sovereigns. The

---

*\**Joshua L. Dratel, Quentin Riegel,* and *Jeremy Maltby* filed a brief for the National Association of Criminal Defense Lawyers et al. as *amici curiae* urging reversal.

question presented in this case is whether a plot to defraud a foreign government of tax revenue violates the federal wire fraud statute, 18 U. S. C. § 1343 (2000 ed., Supp. II). Because the plain terms of § 1343 criminalize such a scheme, and because this construction of the wire fraud statute does not derogate from the common-law revenue rule, we hold that it does.

I

Petitioners Carl J. Pasquantino, David B. Pasquantino, and Arthur Hilts were indicted for and convicted of federal wire fraud for carrying out a scheme to smuggle large quantities of liquor into Canada from the United States. According to the evidence presented at trial, the Pasquantinos, while in New York, ordered liquor over the telephone from discount package stores in Maryland. See 336 F. 3d 321, 325 (CA4 2003) (en banc). They employed Hilts and others to drive the liquor over the Canadian border, without paying the required excise taxes. *Ibid.* The drivers avoided paying taxes by hiding the liquor in their vehicles and failing to declare the goods to Canadian customs officials. *Id.*, at 333. During the time of petitioners' smuggling operation, between 1996 and 2000, Canada heavily taxed the importation of alcoholic beverages. See 1997 S. C., ch. 36, §§ 21.1(1), 21.2(1); Excise Act Schedule 1.(1), R. S. C., ch. E–14 (1985); Excise Act 2001, Schedule 4, ch. 22, 2002 S. C. 239. Uncontested evidence at trial showed that Canadian taxes then due on alcohol purchased in the United States and transported to Canada were approximately double the liquor's purchase price. App. 65–66.

Before trial, petitioners moved to dismiss the indictment on the ground that it stated no wire fraud offense. The wire fraud statute prohibits the use of interstate wires to effect "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U. S. C. § 1343 (2000 ed., Supp. II). Petitioners contended that the Government lacked a

sufficient interest in enforcing the revenue laws of Canada, and therefore that they had not committed wire fraud. App. 48–57. The District Court denied the motion, and the case went to trial. The jury convicted petitioners of wire fraud.

Petitioners appealed their convictions to the United States Court of Appeals for the Fourth Circuit, again urging that the indictment failed to state a wire fraud offense. They argued that their prosecution contravened the common-law revenue rule, because it required the court to take cognizance of the revenue laws of Canada. Over Judge Hamilton's dissent, the panel agreed and reversed the convictions. 305 F. 3d 291, 295 (2002). Petitioners also argued that Canada's right to collect taxes from them was not "money or property" within the meaning of the wire fraud statute, but the panel unanimously rejected that argument. *Id.*, at 294–295; *id.*, at 299 (Hamilton, J., dissenting).

The Court of Appeals granted rehearing en banc, vacated the panel's decision, and affirmed petitioners' convictions. 336 F. 3d 321 (CA4 2003). It concluded that the common-law revenue rule, rather than barring any recognition of foreign revenue law, simply allowed courts to refuse to enforce the tax judgments of foreign nations, and therefore did not preclude the Government from prosecuting petitioners. *Id.*, at 327–329. The Court of Appeals held as well that Canada's right to receive tax revenue was "money or property" within the meaning of the wire fraud statute. *Id.*, at 331–332.

We granted certiorari to resolve a conflict in the Courts of Appeals over whether a scheme to defraud a foreign government of tax revenue violates the wire fraud statute. 541 U. S. 972 (2004). Compare *United States* v. *Boots,* 80 F. 3d 580, 587 (CA1 1996) (holding that a scheme to defraud a foreign nation of tax revenue does not violate the wire fraud statute), with *United States* v. *Trapilo,* 130 F. 3d 547, 552–553 (CA2 1997) (holding that a scheme to defraud a foreign nation of tax revenue violates the wire fraud statute). We

 

agree with the Court of Appeals that it does and therefore affirm the judgment below.[1]

## II

We first consider whether petitioners' conduct falls within the literal terms of the wire fraud statute. The statute prohibits using interstate wires to effect "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U. S. C. § 1343 (2000 ed., Supp. II). Two elements of this crime, and the only two that petitioners dispute here, are that the defendant engage in a "scheme or artifice to defraud," *ibid.*, and that the "object of the fraud . . . be '[money or] property' in the victim's hands," *Cleveland* v. *United States*, 531 U. S. 12, 26 (2000).[2] Petitioners' smuggling operation satisfies both elements.

Taking the latter element first, Canada's right to uncollected excise taxes on the liquor petitioners imported into Canada is "property" in its hands. This right is an entitlement to collect money from petitioners, the possession of which is "something of value" to the Government of Canada. *McNally* v. *United States*, 483 U. S. 350, 358 (1987) (internal

---

[1] We express no view on the related question whether a foreign government, based on wire or mail fraud predicate offenses, may bring a civil action under the Racketeer Influenced and Corrupt Organizations Act (RICO) for a scheme to defraud it of taxes. See *Attorney General of Canada* v. *R. J. Reynolds Tobacco Holdings, Inc.*, 268 F. 3d 103, 106 (CA2 2001) (holding that the Government of Canada cannot bring a civil RICO suit to recover for a scheme to defraud it of taxes); *Republic of Honduras* v. *Philip Morris Cos.*, 341 F. 3d 1253, 1255 (CA11 2003) (same with respect to other foreign governments).

[2] Although *Cleveland* interpreted the term "property" in the mail fraud statute, 18 U. S. C. § 1341 (2000 ed., Supp. II), we have construed identical language in the wire and mail fraud statutes *in pari materia.* See *Neder* v. *United States*, 527 U. S. 1, 20 (1999) ("'scheme or artifice to defraud'"); *Carpenter* v. *United States*, 484 U. S. 19, 25, and n. 6 (1987) ("scheme or artifice to defraud"; "money or property").

quotation marks omitted). Valuable entitlements like these are "property" as that term ordinarily is employed. See *Leocal* v. *Ashcroft*, 543 U. S. 1, 9 (2004) ("When interpreting a statute, we must give words their ordinary or natural meaning" (internal quotation marks omitted)); Black's Law Dictionary 1382 (4th ed. 1951) (defining "property" as "extend[ing] to every species of valuable right and interest"). Had petitioners complied with this legal obligation, they would have paid money to Canada. Petitioners' tax evasion deprived Canada of that money, inflicting an economic injury no less than had they embezzled funds from the Canadian treasury. The object of petitioners' scheme was to deprive Canada of money legally due, and their scheme thereby had as its object the deprivation of Canada's "property."

The common law of fraud confirms this characterization of Canada's right to excise taxes. The right to be paid money has long been thought to be a species of property. See 3 W. Blackstone, Commentaries on the Laws of England 153–155 (1768) (classifying a right to sue on a debt as personal property); 2 J. Kent, Commentaries on American Law *351 (same). Consistent with that understanding, fraud at common law included a scheme to deprive a victim of his entitlement to money. For instance, a debtor who concealed his assets when settling debts with his creditors thereby committed common-law fraud. 1 J. Story, Equity Jurisprudence § 378 (I. Redfield 10th rev. ed. 1870); *Chesterfield* v. *Janssen*, 28 Eng. Rep. 82, 2 Ves. Sen. 125 (ch. 1750); 1 S. Rapalje & R. Lawrence, A Dictionary of American and English Law 546 (1883). That made sense given the economic equivalence between money in hand and money legally due. The fact that the victim of the fraud happens to be the government, rather than a private party, does not lessen the injury.

Our conclusion that the right to tax revenue is property in Canada's hands, contrary to petitioners' contentions, is consistent with *Cleveland, supra.* In that case, the defendant,

Cleveland, had obtained a video poker license by making false statements on his license application. *Id.*, at 16–17. We held that a State's interest in an unissued video poker license was not "property," because the interest in choosing particular licensees was "'purely regulatory'" and "[could not] be economic." *Id.*, at 22–23. We also noted that "the Government nowhere allege[d] that Cleveland defrauded the State of any money to which the State was entitled by law." *Ibid.*

*Cleveland* is different from this case. Unlike a State's interest in allocating a video poker license to particular applicants, Canada's entitlement to tax revenue is a straightforward "economic" interest. There was no suggestion in *Cleveland* that the defendant aimed at depriving the State of any money due under the license; quite the opposite, there was "no dispute that [the defendant's partnership] paid the State of Louisiana its proper share of revenue" due. *Id.*, at 22. Here, by contrast, the Government alleged and proved that petitioners' scheme aimed at depriving Canada of money to which it was entitled by law. Canada could hardly have a more "economic" interest than in the receipt of tax revenue. *Cleveland* is therefore consistent with our conclusion that Canada's entitlement is "property" as that word is used in the wire fraud statute.

Turning to the second element at issue here, petitioners' plot was a "scheme or artifice to defraud" Canada of its valuable entitlement to tax revenue. The evidence showed that petitioners routinely concealed imported liquor from Canadian officials and failed to declare those goods on customs forms. See 336 F. 3d, at 333. By this conduct, they represented to Canadian customs officials that their drivers had no goods to declare. This, then, was a scheme "designed to defraud by representations," *Durland* v. *United States*, 161 U. S. 306, 313 (1896), and therefore a "scheme or artifice to defraud" Canada of taxes due on the smuggled goods.

Neither the antismuggling statute, 18 U. S. C. § 546,[3] nor U. S. tax treaties, see *Attorney General of Canada* v. *R. J. Reynolds Tobacco Holdings, Inc.*, 268 F. 3d 103, 115–119 (CA2 2001), convince us that petitioners' scheme falls outside the terms of the wire fraud statute.[4] Unlike the treaties and the antismuggling statute, the wire fraud statute punishes fraudulent use of domestic wires, whether or not such conduct constitutes smuggling, occurs aboard a vessel, or evades foreign taxes. See *post*, at 380, n. 9 (GINSBURG, J., dissenting) (noting that the antismuggling statute does not apply to this prosecution). Petitioners would be equally liable if they had used interstate wires to defraud Canada not of taxes due, but of money from the Canadian treasury. The wire fraud statute "applies without differentiation" to these two categories of fraud. *Clark* v. *Martinez*, 543 U. S. 371, 378 (2005). "To give these same words a different meaning

---

[3] Section 546 provides:

"Any person owning in whole or in part any vessel of the United States who employs, or participates in, or allows the employment of, such vessel for the purpose of smuggling, or attempting to smuggle, or assisting in smuggling, any merchandise into the territory of any foreign government in violation of the laws there in force, if under the laws of such foreign government any penalty or forfeiture is provided for violation of the laws of the United States respecting the customs revenue, and any citizen of, or person domiciled in, or any corporation incorporated in, the United States, controlling or substantially participating in the control of any such vessel, directly or indirectly, whether through ownership of corporate shares or otherwise, and allowing the employment of said vessel for any such purpose, and any person found, or discovered to have been, on board of any such vessel so employed and participating or assisting in any such purpose, shall be fined under this title or imprisoned not more than two years, or both."

[4] Any overlap between the antismuggling statute and the wire fraud statute is beside the point. The Federal Criminal Code is replete with provisions that criminalize overlapping conduct. See Stuntz, The Pathological Politics of Criminal Law, 100 Mich. L. Rev. 505, 518, and n. 62 (2002); *United States* v. *Wells*, 519 U. S. 482, 505–509, and nn. 8–10 (1997) (STEVENS, J., dissenting). The mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either.

for each category would be to invent a statute rather than interpret one." *Ibid.* We therefore decline to "interpret [this] criminal statute more narrowly than it is written." *Brogan* v. *United States,* 522 U. S. 398, 406 (1998).

## III

We next consider petitioners' revenue rule argument. Petitioners argue that, to avoid reading § 1343 to derogate from the common-law revenue rule, we should construe the otherwise-applicable language of the wire fraud statute to except frauds directed at evading foreign taxes. Their argument relies on the canon of construction that "[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *United States* v. *Texas,* 507 U. S. 529, 534 (1993) (internal quotation marks omitted). This presumption is, however, no bar to a construction that conflicts with a common-law rule if the statute " 'speak[s] directly' to the question addressed by the common law." *Ibid.*

Whether the wire fraud statute derogates from the common-law revenue rule depends, in turn, on whether reading § 1343 to reach this prosecution conflicts with a well-established revenue rule principle. We clarified this constraint on the application of the nonderogation canon in *United States* v. *Craft,* 535 U. S. 274 (2002). The issue in *Craft* was whether the property interest of a tenant by the entirety was exempt from a federal tax lien. *Id.,* at 276. We construed the federal tax lien statute to reach such a property interest, despite the tension between that construction and the common-law rule that entireties property enjoys immunity from liens, because this "common-law rule was not so well established with respect to the application of a federal tax lien that we must assume that Congress considered the impact of its enactment on the question now before us."

*Id.*, at 288.[5]   So too here, before we may conclude that Congress intended to exempt the present prosecution from the broad reach of the wire fraud statute, we must find that the common-law revenue rule clearly barred such a prosecution. We examine the state of the common law as of 1952, the year Congress enacted the wire fraud statute.   See *Neder* v. *United States*, 527 U. S. 1, 22–23 (1999).[6]

The wire fraud statute derogates from no well-established revenue rule principle.   We are aware of no common-law revenue rule case decided as of 1952 that held or clearly implied that the revenue rule barred the United States from prosecuting a fraudulent scheme to evade foreign taxes. The traditional rationales for the revenue rule, moreover, do not plainly suggest that it swept so broadly.   We consider these two points in turn.

## A

We first consider common-law revenue rule jurisprudence as it existed in 1952, the year Congress enacted § 1343. Since the late 19th and early 20th century, courts have treated the common-law revenue rule as a corollary of the

---

[5] See also *United States* v. *Texas*, 507 U. S. 529, 534 (1993) (requiring the statute to "'speak directly' to the question addressed by the common law"); *Astoria Fed. Sav. & Loan Assn.* v. *Solimino*, 501 U. S. 104, 108 (1991) (stating that this presumption is applicable "where a common-law principle is well established"); *United States* v. *Turley*, 352 U. S. 407, 411 (1957) (declining to interpret the term "'stolen'" in a federal criminal statute according to the common law because the term had "no accepted common-law meaning").

[6] These principles convince us that much more than the summary conclusion that it is "unavoidably obvious ... that this prosecution directly implicates the revenue rule" and that this prosecution is "'primarily about enforcing Canadian law,'" *post*, at 377, 382 (GINSBURG, J., dissenting), is required to demonstrate that a revenue rule principle firmly established as of 1952 bars this prosecution. That task requires inquiry into common-law revenue rule jurisprudence—an inquiry the dissent does not undertake.

rule that, as Chief Justice Marshall put it, "[t]he Courts of no country execute the penal laws of another." *The Antelope*, 10 Wheat. 66, 123 (1825). The rule against the enforcement of foreign penal statutes, in turn, tracked the common-law principle that crimes could only be prosecuted in the country in which they were committed. See, *e. g.*, J. Story, Commentaries on the Conflict of Laws § 620, p. 840 (M. Bigelow ed. 8th ed. 1883). The basis for inferring the revenue rule from the rule against foreign penal enforcement was an analogy between foreign revenue laws and penal laws. See *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265, 290 (1888); Leflar, Extrastate Enforcement of Penal and Governmental Claims, 46 Harv. L. Rev. 193, 219 (1932) (hereinafter Leflar).

Courts first drew that inference in a line of cases prohibiting the enforcement of tax liabilities of one sovereign in the courts of another sovereign, such as a suit to enforce a tax judgment.[7] The revenue rule's grounding in these cases shows that, at its core, it prohibited the collection of tax obligations of foreign nations. Unsurprisingly, then, the revenue rule is often stated as prohibiting the collection of foreign tax claims. See Brief for Petitioners 16 (noting that "[t]he most straightforward application of the revenue rule arises when a foreign sovereign attempts to sue directly in its own right to enforce a tax judgment in the courts of another nation").[8]

---

[7] See *Colorado* v. *Harbeck*, 232 N. Y. 71, 85, 133 N. E. 357, 360 (App. 1921); *Maryland* v. *Turner*, 75 Misc. 9, 10–13, 132 N. Y. S. 173, 175 (Sup. Ct. 1911); *Detroit* v. *Proctor*, 44 Del. 193, 200–202, 61 A. 2d 412, 415–416 (Super. Ct. 1948); *Moore* v. *Mitchell*, 30 F. 2d 600, 603–604 (CA2 1929) (L. Hand, J., concurring) (citing cases), aff'd on other grounds, 281 U. S. 18 (1930); *Arkansas* v. *Bowen*, 20 D. C. 291, 295 (Sup. Ct. 1891), aff'd, 3 App. D. C. 537 (1894); Leflar 216, n. 63 (citing cases).

[8] See also *Her Majesty the Queen* v. *Gilbertson*, 597 F. 2d 1161, 1163–1164 (CA9 1979) (stating the revenue rule as an exception to the rule that a State enforces foreign judgments, citing, *inter alia*, pre-1952 cases); *Peter Buchanan Ltd.* v. *McVey*, 1955 A. C. 516, 526 (Ir. H. Ct. 1950),

The present prosecution is unlike these classic examples of actions traditionally barred by the revenue rule. It is not a suit that recovers a foreign tax liability, like a suit to enforce a judgment. This is a criminal prosecution brought by the United States in its sovereign capacity to punish domestic criminal conduct. Petitioners nevertheless argue that common-law revenue rule jurisprudence as of 1952 prohibited such prosecutions. Revenue rule cases, however, do not establish that proposition, much less clearly so.

1

Petitioners first analogize the present action to several cases that have applied the revenue rule to bar indirect enforcement of foreign revenue laws, in contrast to the direct collection of a tax obligation. They cite, for example, a decision of an Irish trial court holding that a private liquidator could not recover assets unlawfully distributed and moved to Ireland by a corporate director, because the recovery would go to satisfy the company's Scottish tax obligations. *Peter Buchanan Ltd.* v. *McVey*, 1955 A. C. 516, 529–530 (Ir. H. Ct. 1950), app. dism'd, 1955 A. C. 530 (Ir. Sup. Ct. 1951).[9]

_____

app. dism'd, 1955 A. C. 530 (Ir. Sup. Ct. 1951) (citing English revenue rule cases as "establish[ing] that the courts of our country will not enforce the revenue claims of a foreign country in a suit brought for the purpose by a foreign public authority"); Leflar 219 (stating the revenue rule as a prohibition on "extrastate actions for revenue collection"); *Moore, supra,* at 603 (L. Hand, J., concurring) (characterizing the revenue rule as an exception to the rule that a "liability arising under the law of a foreign state will be recognized by the courts of another"); *Harbeck, supra,* at 85, 133 N. E., at 360 (stating that the revenue rule "precludes one state from acting as a collector of taxes for a sister state"); cf. Restatement (Third) of Foreign Relations Law of the United States § 483 (1986) (stating that the rule does not require, but allows, courts to refuse enforcement of foreign tax judgments).

[9] Petitioners also cite *QRS 1 Aps* v. *Frandsen,* [2000] Int'l Litig. Proc. 8, [1999] 3 All E. R. 289 (App.) (holding that a liquidator was not entitled to recover corporate funds needed to pay foreign taxes); *Stringam* v. *Dubois,* [1993] 3 W. W. R. 273, 7 Alta. L. R. (3d) 120 (App. 1992) (rejecting suit by

The court found that "the sole object of the liquidation proceedings in Scotland was to collect a revenue debt," because if the liquidator won, "every penny recovered after paying certain costs . . . could be claimed by the Scottish Revenue." *Id.*, at 530. According to the *Buchanan* court, "[i]n every case the substance of the claim must be scrutinized, and if it then appears that it is really a suit brought for the purpose of collecting the debts of a foreign revenue it must be rejected." *Id.*, at 529.

*Buchanan* and the other cases on which petitioners rely cannot bear the weight petitioners place on them. Many of them were decided after 1952, too late for the Congress that passed the wire fraud statute to have relied on them. Others come from foreign courts. Drawing sure inferences regarding Congress' intent from such foreign citations is perilous, as several of petitioners' cases illustrate.[10]

---

the U. S. executor of a will to require the sale of real property in Canada to pay U. S. estate taxes); *Banco Do Brasil, S. A.* v. *A. C. Israel Commodity Co.*, 12 N. Y. 2d 371, 377, 190 N. E. 2d 235, 237 (App. 1963) (rejecting suit by instrumentality of Brazil to recover for a conspiracy to circumvent its foreign exchange regulations); *United States* v. *Harden*, [1963] 44 W. W. R. 630, 633, S. C. R. 366, 370–371 (Sup. Ct. Can.) (holding that a stipulated judgment to pay U. S. taxes was not enforceable in Canadian courts); *Attorney-General for Canada* v. *Schulze*, [1901] 9 Scots Law Times 4, 4–5 (refusing to enforce judgment for court costs, where costs were incurred by a foreign state in defending the legality of its forfeiture of the defendant's goods as penalty for infraction of revenue laws); *Indian and General Investment Trust, Ltd.* v. *Borax Consolidated, Ltd.*, [1920] 1 K. B. 539, 550 (holding that a private debtor was not entitled to deduct U. S. income tax from its interest payments on loan due in England).

[10] For example, in *Government of India* v. *Taylor*, 1955 A. C. 491 (H. L.), on which petitioners rely heavily, the court's application of the revenue rule rested in part on a ground peculiar to English law, namely, that an Act of Parliament had excluded tax judgments from a statute that provided for the enforcement of foreign judgments. That Act thus demonstrated that the revenue rule "appear[ed] to have been recognized by Parliament." *Id.*, at 506; see also *Borax, supra*, at 549 (holding that a private debtor was not entitled to deduct U. S. income tax from its interest payments on a loan, in part because "there [was] an express Act of Parliament which

More important, none of these cases clearly establishes that the revenue rule barred this prosecution. None involved a domestic sovereign acting pursuant to authority conferred by a criminal statute. The difference is significant. An action by a domestic sovereign enforces the sovereign's own penal law. A prohibition on the enforcement of *foreign* penal law does not plainly prevent the Government from enforcing a *domestic* criminal law. Such an extension, to our knowledge, is unprecedented in the long history of either the revenue rule or the rule against enforcement of penal laws.

Moreover, none of petitioners' cases (with the arguable exception of *Banco Do Brasil, S. A.* v. *A. C. Israel Commodity Co.,* 12 N. Y. 2d 371, 190 N. E. 2d 235 (App. 1963)) barred an action that had as its primary object the deterrence and punishment of fraudulent conduct—a substantial domestic regulatory interest entirely independent of foreign tax enforcement. The main object of the action in each of those cases was the collection of money that would pay foreign tax claims. The absence of such an object in this action means that the link between this prosecution and foreign tax collection is incidental and attenuated at best, making it not plainly one in which "the whole object of the suit is to collect tax for a foreign revenue." *Buchanan, supra,* at 529. Even those courts that as of 1952 had extended the revenue rule beyond its core prohibition had not faced a case closely

permits payment to the English Income Tax authorities to be a discharge pro tanto of the debt which a person owes in respect of yearly interest to another" while "[t]here [was] no Act of Parliament which allows payment of income tax to another country to be reckoned as discharge"); *Schulze, supra,* at 5 (holding that a foreign state could not recover court costs incurred in defending the legality of a tax forfeiture, in part because "in our [*i. e.,* Scottish] law, the expenses of an action have always been regarded as a mere accessory or incident of the principal claim"). In addition, as we explain below, features peculiar to the American system of separation of powers cast doubt on the notion that the revenue rule bars this prosecution. See *infra,* at 369–370.

analogous to this one—and thus we cannot say with any reasonable certainty whether Congress in 1952 would have considered this prosecution within the revenue rule.

Petitioners answer that the recovery of taxes is indeed the object of this suit, because restitution of the lost tax revenue to Canada is required under the Mandatory Victims Restitution Act of 1996, 18 U. S. C. §§ 3663A–3664 (2000 ed. and Supp. II).[11] We do not think it matters whether the provision of restitution is mandatory in this prosecution. Regardless, the wire fraud statute advances the Federal Government's independent interest in punishing fraudulent domestic criminal conduct, a significant feature absent from all of petitioners' revenue rule cases. The purpose of awarding restitution in this action is not to collect a foreign tax, but to mete out appropriate criminal punishment for that conduct.

In any event, any conflict between mandatory restitution and the revenue rule would not change our holding today. If awarding restitution to foreign sovereigns were contrary to the revenue rule, the proper resolution would be to construe the Mandatory Victims Restitution Act not to allow such awards, rather than to assume that the later enacted restitution statute impliedly repealed § 1343 as applied to frauds against foreign sovereigns.

2

We are no more persuaded by a second line of cases on which petitioners rely. Petitioners analogize the present case to early English common-law cases from which the revenue rule originally derived. Those early cases involved contract law, and they held that contracts executed with the purpose of evading the revenue laws of other nations were enforceable, notwithstanding the rule against enforcing con-

---

[11] See 18 U. S. C. § 3663A(c)(1)(A)(ii) ("This section shall apply in all sentencing proceedings for convictions of . . . an offense against property under this title . . . including any offense committed by fraud or deceit").

tracts with illegal purposes. See *Boucher* v. *Lawson*, Cas. T. Hard. 85, 89–90, 95 Eng. Rep. 53, 55–56 (K. B. 1734); *Planche* v. *Fletcher*, 1 Dougl. 251, 99 Eng. Rep. 164 (K. B. 1779). Petitioners argue that these cases demonstrate that "indirect" enforcement of revenue laws is at the very core of the common-law revenue rule, rather than at its margins.

The argument is unavailing. By the mid-20th century, the revenue rule had developed into a doctrine very different from its original form. Early revenue rule cases were driven by the interest in lessening the commercial disruption caused by the high tariffs of the day. As Lord Hardwicke explained, if contracts that aimed at circumventing foreign revenue laws were unenforceable, "it would cut off all benefit of such trade from this kingdom, which would be of very bad consequence to the principal and most beneficial branches of our trade." *Boucher, supra,* at 89, 95 Eng. Rep., at 56. By the 20th century, however, that rationale for the revenue rule had been supplanted. By then, as we have explained, courts had begun to apply the revenue rule to tax obligations on the strength of the analogy between a country's revenue laws and its penal ones, see *supra,* at 360–361, superseding the original promotion-of-commerce rationale for the rule. Dodge, Breaking the Public Law Taboo, 43 Harv. Int'l L. J. 161, 178 (2002); *Buchanan,* 1955 A. C., at 522–524, 528–529. The early English cases rest on a far different foundation from that on which the revenue rule came to rest. They thus say little about whether the wire fraud statute derogated from the revenue rule in its mid-20th-century form.

### 3

Granted, this criminal prosecution "enforces" Canadian revenue law in an attenuated sense, but not in a sense that clearly would contravene the revenue rule. From its earliest days, the revenue rule never proscribed all enforcement of foreign revenue law. For example, at the same time they were enforcing domestic contracts that had the purpose of

violating foreign revenue law, English courts also considered void foreign contracts that lacked tax stamps required under foreign revenue law. See *Alves* v. *Hodgson*, 7 T. R. 241, 243, 101 Eng. Rep. 953, 955 (K. B. 1797); *Clegg* v. *Levy*, 3 Camp. 166, 167, 170 Eng. Rep. 1343 (N. P. 1812). Like the present prosecution, cases voiding foreign contracts under foreign law no doubt "enforced" foreign revenue law in the sense that they encouraged the payment of foreign taxes; yet they fell outside the revenue rule's scope. The line the revenue rule draws between impermissible and permissible "enforcement" of foreign revenue law has therefore always been unclear.

The uncertainty persisted in American courts that recognized the revenue rule. In one of the earliest appearances of the revenue rule in America, the Supreme Court of New Hampshire entertained an action that required extensive recognition of a sister State's revenue laws. *Henry* v. *Sargeant*, 13 N. H. 321 (1843). There, the plaintiff sought damages, alleging that a Vermont selectman had imposed an illegal tax on him. *Id.*, at 331. The court found that the revenue rule did not bar the action, *id.*, at 331–332, though the suit required the court to enforce the revenue laws of Vermont, see *id.*, at 335–338.

Likewise, in *In re Hollins*, 79 Misc. 200, 139 N. Y. S. 713 (Sur. Ct.), aff'd, 160 App. Div. 886, 144 N. Y. S. 1121 (1913), aff'd, 212 N. Y. 567, 106 N. E. 1034 (App. 1914) *(per curiam)*, the court held that an estate executor could satisfy foreign taxes due on a decedent's estate out of property of the estate, notwithstanding a legatee's argument that the revenue rule barred authorizing such payments. 79 Misc., at 207–208, 139 N. Y. S., at 716–717. The court explained:

> "While it is doubtless true that this court will not aid a foreign country in the enforcement of its revenue laws, it will not refuse to direct a just and equitable administration of that part of an estate within its jurisdiction merely because such direction would result in the

enforcement of such revenue laws." *Id.*, at 208, 139 N. Y. S., at 717.

These cases demonstrate that the extent to which the revenue rule barred indirect recognition of foreign revenue laws was unsettled as of 1952. Following the reasoning of *In re Hollins*, for instance, Congress might well have thought that courts would enforce the wire fraud statute, even if doing so might incidentally recognize Canadian revenue law. The uncertainty highlights that "[i]ndirect enforcement is . . . easier to describe than to define," and "it is sometimes difficult to draw the line between an issue involving merely recognition of a foreign law and indirect enforcement of it." 1 A. Dicey & J. Morris, Conflict of Laws 90 (L. Collins gen. ed. 13th ed. 2000). Even if the present prosecution is analogous to the indirect enforcement cases on which petitioners rely, those cases do not yield a rule sufficiently well established to narrow the wire fraud statute in the context of this criminal prosecution.

## B

Having concluded that revenue rule jurisprudence is no clear bar to this prosecution, we next turn to whether the purposes of the revenue rule, as articulated in the relevant authorities, suggest differently. They do not.

First, this prosecution poses little risk of causing the principal evil against which the revenue rule was traditionally thought to guard: judicial evaluation of the policy-laden enactments of other sovereigns. See, *e. g., Moore* v. *Mitchell*, 30 F. 2d 600, 604 (CA2 1929) (L. Hand, J., concurring). As Judge Hand put it, allowing courts to enforce another country's revenue laws was thought to be a delicate inquiry

> "when it concerns the relations between the foreign state and its own citizens . . . . To pass upon the provisions for the public order of another state is, or at any rate should be, beyond the powers of a court; it involves

the relations between the states themselves, with which courts are incompetent to deal, and which are intrusted to other authorities." *Ibid.*

The present prosecution creates little risk of causing international friction through judicial evaluation of the policies of foreign sovereigns. This action was brought by the Executive to enforce a statute passed by Congress. In our system of government, the Executive is "the sole organ of the federal government in the field of international relations," *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 320 (1936), and has ample authority and competence to manage "the relations between the foreign state and its own citizens" and to avoid "embarass[ing] its neighbor[s]," *Moore, supra,* at 604 (L. Hand, J., concurring); see also *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, 111 (1948). True, a prosecution like this one requires a court to recognize foreign law to determine whether the defendant violated U. S. law. But we may assume that by electing to bring this prosecution, the Executive has assessed this prosecution's impact on this Nation's relationship with Canada, and concluded that it poses little danger of causing international friction. We know of no common-law court that has applied the revenue rule to bar an action accompanied by such a safeguard, and neither petitioners nor the dissent directs us to any. The greater danger, in fact, would lie in our judging this prosecution barred based on the foreign policy concerns animating the revenue rule, concerns that we have "neither aptitude, facilities nor responsibility" to evaluate. *Ibid.*

More broadly, petitioners argue that the revenue rule avoids giving domestic effect to politically sensitive and controversial policy decisions embodied in foreign revenue laws, regardless of whether courts need pass judgment on such laws. See *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398, 448 (1964) (White, J., dissenting) ("[C]ourts customarily

refuse to enforce the revenue and penal laws of a foreign state, since no country has an obligation to further the governmental interests of a foreign sovereign"). This worries us little here. The present prosecution, if authorized by the wire fraud statute, embodies the policy choice of the two political branches of our Government—Congress and the Executive—to free the interstate wires from fraudulent use, irrespective of the object of the fraud. Such a reading of the wire fraud statute gives effect to that considered policy choice. It therefore poses no risk of advancing the policies of Canada illegitimately.

Still a final revenue rule rationale petitioners urge is the concern that courts lack the competence to examine the validity of unfamiliar foreign tax schemes. See, *e. g.,* Leflar 218. Foreign law, of course, posed no unmanageable complexity in this case. The District Court had before it uncontroverted testimony of a Government witness that petitioners' scheme aimed at violating Canadian tax law. See App. 65–66.

Nevertheless, Federal Rule of Criminal Procedure 26.1 addresses petitioners' concern by setting forth a procedure for interpreting foreign law that improves on those available at common law. Specifically, it permits a court, in deciding issues of foreign law, to consider "any relevant material or source—including testimony—without regard to the Federal Rules of Evidence." By contrast, common-law procedures for dealing with foreign law—those available to the courts that formulated the revenue rule—were more cumbersome. See Advisory Committee's Notes on Fed. Rule Crim. Proc. 26.1, 18 U. S. C. App., p. 1606 (noting that the rule improves on common-law procedures for proving foreign law). Rule 26.1 gives federal courts sufficient means to resolve the incidental foreign law issues they may encounter in wire fraud prosecutions.

## IV

Finally, our interpretation of the wire fraud statute does not give it "extraterritorial effect."[12]   *Post,* at 378 (GINSBURG, J., dissenting).   Petitioners used U. S. interstate wires to execute a scheme to defraud a foreign sovereign of tax revenue.   Their offense was complete the moment they executed the scheme inside the United States; "[t]he wire fraud statute punishes the scheme, not its success."   *United States* v. *Pierce,* 224 F. 3d 158, 166 (CA2 2000) (internal quotation marks and brackets in original omitted); see *Durland,* 161 U. S., at 313 ("The significant fact is the intent and purpose").   This domestic element of petitioners' conduct is what the Government is punishing in this prosecution, no less than when it prosecutes a scheme to defraud a foreign individual or corporation, or a foreign government acting as a market participant.   See *post,* at 379, n. 8 (GINSBURG, J., dissenting) (noting that such prosecutions of foreign individuals, corporations, and governments are domestic applications of the wire fraud statute).[13]   In any event, the wire fraud statute punishes frauds executed "in interstate or for-

_____

[12] As some indication of the novelty of the dissent's "extraterritoriality" argument, we note that this argument was not pressed or passed upon below and was raised only as an afterthought in petitioners' reply brief, depriving the Government of a chance to respond.   Reply Brief for Petitioners 17–18.

[13] The dissent says that a scheme to defraud a foreign corporation or individual "does not necessarily depend on any determination of foreign law" and therefore "is of a different order."   *Post,* at 379, n. 8 (opinion of GINSBURG, J.).   That is not so.   Many such schemes will necessarily require interpretation of foreign law.   Without proof of foreign law, it is impossible to tell whether the scheme had the purpose of depriving the foreign corporation or individual of valuable property interests as defined by foreign law.   See *supra,* at 355–356; *United States* v. *Pierce,* 224 F. 3d 158, 165–168 (CA2 2000).   The fact that a prosecution might involve foreign revenue law, rather than any other type of foreign law, is relevant to whether such a prosecution is in derogation of the revenue rule, see *supra,* at 359–370, not to whether it is "extraterritorial."

eign commerce," 18 U. S. C. § 1343 (2000 ed., Supp. II), so this is surely not a statute in which Congress had only "domestic concerns in mind." *Small* v. *United States, post,* at 388.

\* \* \*

It may seem an odd use of the Federal Government's resources to prosecute a U. S. citizen for smuggling cheap liquor into Canada. But the broad language of the wire fraud statute authorizes it to do so, and no canon of statutory construction permits us to read the statute more narrowly. The judgment of the Court of Appeals is affirmed.[14]

*It is so ordered.*

JUSTICE GINSBURG, with whom JUSTICE BREYER joins, and with whom JUSTICE SCALIA and JUSTICE SOUTER join as to Parts II and III, dissenting.

This case concerns extension of the "wire fraud" statute, 18 U. S. C. § 1343 (2000 ed., Supp. II), to a scenario extraterritorial in significant part: The Government invoked the statute to reach a scheme to smuggle liquor from the United States into Canada and thereby deprive Canada of revenues due under that nation's customs and tax laws. Silent on its application to activity culminating beyond our borders, the statute prohibits "any scheme" to defraud that employs in its execution communication through interstate or interna-

---

[14] Petitioners argue in a footnote that their sentences should be vacated in light of *Blakely* v. *Washington,* 542 U. S. 296 (2004). Brief for Petitioners 26, n. 29. Petitioners did not raise this claim before the Court of Appeals or in their petition for certiorari. We therefore decline to address it. See, *e. g., Lopez* v. *Davis,* 531 U. S. 230, 244, n. 6 (2001) (declining to address "matter . . . not raised or decided below, or presented in the petition for certiorari"); *Whitfield* v. *United States,* 543 U. S. 209 (2005) (affirming federal convictions despite the imposition of sentence enhancements, see Brief for Petitioners therein, O. T. 2004, No. 03–1293 etc., p. 7, n. 6).

tional wires. A relevant background norm, known as the common-law revenue rule, bars suit in one country to enforce another country's tax laws.

The scheme at issue involves liquor purchased from discount sellers in Maryland, trucked to New York, then smuggled into Canada to evade Canada's hefty tax on imported alcohol.[1] Defendants below, petitioners here, were indicted under § 1343 for devising a scheme "to defraud the governments of Canada and the Province of Ontario of excise duties and tax revenues relating to the importation and sale of liquor." App. to Pet. for Cert. 58a. Each of the six counts in question was based on telephone calls between New York and Maryland. *Id.*, at 60a–64a.

The Court today reads the wire fraud statute to draw into our courts, at the prosecutor's option, charges that another nation's revenue laws have been evaded. The common-law revenue rule does not stand in the way, the Court instructs, for that rule has no application to criminal prosecutions under the wire fraud statute.

As I see it, and as petitioners urged, Reply Brief 17–19, the Court has ascribed an exorbitant scope to the wire fraud statute, in disregard of our repeated recognition that "Congress legislates against the backdrop of the presumption against extraterritoriality." See *EEOC* v. *Arabian American Oil Co.,* 499 U. S. 244, 248 (1991) *(ARAMCO); Small* v. *United States, post,* at 388–389 (The Court has "adopt[ed] the legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application."); Reply Brief 17, n. 23 ("This prosecution clearly gives the wire fraud statute extraterritorial effect in that '[t]he actions in [Canada] are . . . most naturally understood as the kernel of' Petitioners' alleged fraud." (quoting *Sosa* v. *Alvarez-*

---

[1] The Government offered a Canadian customs officer's testimony at trial that if alcohol is purchased for $56 per case in the United States, the Canadian tax would be approximately $100 per case. App. 65–66; see *infra,* at 376, n. 4.

*Machain*, 542 U. S. 692, 700–701 (2004))).[2]  Notably, when Congress explicitly addressed international smuggling, see 18 U. S. C. § 546, it provided for criminal enforcement of the customs laws of a foreign nation only when that nation has a reciprocal law criminalizing smuggling into the United States.  Currently, Canada has no such reciprocal law.

Of overriding importance in this regard, tax collection internationally is an area in which treaties hold sway.  See *Attorney General of Canada* v. *R. J. Reynolds Tobacco Holdings, Inc.*, 268 F. 3d 103, 115–119 (CA2 2001) (referencing tax treaties to which the United States is a party).  There is a treaty between the United States and Canada regarding the collection of taxes, but that accord requires certification by the taxing nation that the taxes owed have been "finally determined."  See Protocol Amending the Convention with Respect to Taxes on Income and on Capital, Sept. 26, 1980, S. Treaty Doc. No. 104–4, 2030 U. N. T. S. 236, 245, Art. 15, ¶ 2 (entered into force Nov. 9, 1995) (hereinafter Protocol).  Moreover, the treaty is inapplicable to persons, like petitioners in this case, who are United States citizens at the time that the tax liability is incurred.  *Id.*, at 246, Art. 15, ¶ 8.

---

[2] Petitioners' reliance on the presumption against extraterritorial application of laws enacted with domestic concerns in mind was no mere afterthought.  See *ante*, at 371, n. 12.  The presumption was explicitly featured in petitioners' reply brief.  See Reply Brief 17–19, and n. 23 (observing, *inter alia*, that the presumption against extraterritoriality "is especially true when criminal liability is at stake"); see also Brief for Petitioners 40, n. 46.  Both parties ask us to determine the scope of § 1343, and the presumption against extraterritoriality is a guide to interpretation of the kind courts ordinarily bring to bear in endeavoring to discern the meaning of a legislative text.  Moreover, the Government's responses to petitioners' revenue rule arguments coincide with the Government's position on the presumption against extraterritoriality.  Compare Brief for United States 22–26 with Tr. of Oral Arg. 35, 46–47 (responding to the Court's questions about extraterritoriality, counsel for the Government asserted that Congress left to executive discretion the determination whether "enforcement of [foreign] tax systems" is appropriate).

Today's novel decision is all the more troubling for its failure to take account of Canada's primary interest in the matter at stake. United States citizens who have committed criminal violations of Canadian tax law can be extradited to stand trial in Canada.[3] Canadian courts are best positioned to decide "whether, and to what extent, the defendants have defrauded the governments of Canada and Ontario out of tax revenues owed pursuant to their own, sovereign, excise laws." 336 F. 3d 321, 343 (CA4 2003) (en banc) (Gregory, J., dissenting).

I

The Government's prosecution of David Pasquantino, Carl Pasquantino, and Arthur Hilts for wire fraud was grounded in Canadian customs and tax laws. The wire fraud statute, 18 U. S. C. § 1343, required the Government to allege and prove that the defendants engaged in a scheme to defraud a victim—here, the Canadian Government—of money or property. See *ante*, at 356 (describing Canada as the "victim" of a scheme having "as its object the deprivation of Canada's 'property'"). To establish the fraudulent nature of the defendants' scheme and the Canadian Government's entitlement to the money withheld by the defendants, the United States offered proof at trial that Canada imposes import duties on liquor, and that the defendants intended to evade those duties. See App. to Pet. for Cert. 58a; App. 65–74. The defendants' convictions for wire fraud therefore resulted from, and could not have been obtained without proof of, their intent to violate Canadian revenue laws. See *United States* v. *Pierce*, 224 F. 3d 158, 166–168 (CA2 2000) ("If no Canadian duty or tax actually existed, the [defendants] were no more guilty of wire fraud than they would have been had

---

[3] Indeed, the defendants have all been indicted in Canada for failing to report excise taxes and possession of unlawfully imported spirits, 336 F. 3d 321, 343 (CA4 2003) (en banc) (Gregory, J., dissenting), but Canada has not requested their extradition, see Tr. of Oral Arg. 12–13, 30.

they used the wires" to smuggle liquor into New York City, "in the sincere but mistaken belief that New York City imposes a duty on such . . . shipments.").

The United States Government's reliance on Canadian customs and tax laws continued at sentencing. The United States Sentencing Guidelines mandated that the defendants be sentenced on the basis of, among other things, the amount by which the defendants defrauded the Canadian Government. See United States Sentencing Commission, Guidelines Manual § 2F1.1(b)(1) (Nov. 2000). Accordingly, the District Court calculated the number of cases of liquor smuggled into Canada and the aggregate amount of import duties evaded by the defendants. The court concluded that the Pasquantinos avoided over $2.5 million in Canadian duties, and Hilts, over $1.1 million. See App. 97–101, 104–105.[4] The resulting offense-level increases yielded significantly

---

[4] The casual manner in which the Government and the District Court reached these totals detracts from the Court's assertion that "[f]oreign law, of course, posed no unmanageable complexity in this case." *Ante*, at 370. In making its sentencing recommendation to the court, the Government did not proffer evidence of the precise rate at which Canada taxes liquor imports, or reference any provisions of Canadian law. Rather, it relied on the trial testimony of an intelligence officer with Canadian Customs, who surmised, based on her experience in working at the border, that Canadian taxes on a $56 case of liquor would be approximately $100. See App. 104. The customs officer was not offered as an expert witness and "[t]he [D]istrict [C]ourt never determined whether [her] calculations were accurate as a matter of Canadian law." 336 F. 3d, at 343 (Gregory, J., dissenting). Thus, if foreign law posed no complexity in this case, it is not because the parties and the court were easily able to interpret and apply Canadian law, but rather because the Government and the court made no serious attempt to do so. That no such effort was made here, in derogation of the Government's and the court's shared obligation to ensure that the calculations potentially affecting a defendant's sentence are as accurate as possible, is "deeply troubling," *ibid.*, and suggests that the Government was unprepared to grapple with the details of foreign revenue laws.

longer sentences for the defendants.[5]  As Judge Gregory stated in dissent below, the fact that "the bulk of the defendants' sentences were related, not to the American crime of wire fraud, but to the Canadian crime of tax evasion," shows that "this case was primarily about enforcing Canadian law." 336 F. 3d, at 342–343.

Expansively interpreting the text of the wire fraud statute, which prohibits "any scheme or artifice to defraud, or for obtaining money or property by means of . . . fraudulent pretenses," the Court today upholds the Government's deployment of § 1343 essentially to enforce foreign tax law. This Court has several times observed that the wire fraud statute has a long arm, extending to "everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." *Durland* v. *United States*, 161 U. S. 306, 313 (1896).  But the Court has also recognized that incautious reading of the statute could dramatically expand the reach of federal criminal law, and we have refused to apply the proscription exorbitantly.  See *McNally* v. *United States*, 483 U. S. 350, 360 (1987) (refusing

---

[5] I note that petitioners' sentences were enhanced on the basis of judicial factfindings, in violation of the Sixth Amendment.  See *United States* v. *Booker*, 543 U. S. 220, 230–234 (2005) (STEVENS, J., for the Court); see also *Blakely* v. *Washington*, 542 U. S. 296 (2004).  Despite the Court's affirmance of their convictions, therefore, petitioners may be entitled to resentencing.  See *Booker*, 543 U. S., at 268 (BREYER, J., for the Court). The Court declines to address the defendants' plea for resentencing, stating that "[p]etitioners did not raise this claim before the Court of Appeals or in their petition for certiorari."  See *ante*, at 372, n. 14.  This omission was no fault of the defendants, however, as the petition in this case was filed and granted well before the Court decided *Blakely*.  Petitioners thus raised *Blakely* at the earliest possible point: in their merits briefing.  The rule that we do not consider issues not raised in the petition is prudential, not jurisdictional, see *Izumi Seimitsu Kogyo Kabushiki Kaisha* v. *U. S. Philips Corp.*, 510 U. S. 27, 32–33 (1993) *(per curiam)*, and a remand on the *Blakely-Booker* question would neither prejudice the Government nor require this Court to delve into complex issues not passed on below.

to construe 18 U. S. C. § 1341, the mail fraud statute, to reach corruption in local government, stating: "[W]e read § 1341 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has."); see also *Cleveland* v. *United States,* 531 U. S. 12, 24–25 (2000) (holding that § 1341 does not reach schemes to make false statements on a state license application, in part based on reluctance to "approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress").[6]

Construing § 1343 to encompass violations of foreign revenue laws, the Court ignores the absence of anything signaling Congress' intent to give the statute such an extraordinary extraterritorial effect.[7] "It is a longstanding principle of American law," *ARAMCO,* 499 U. S., at 248, that Congress, in most of its legislative endeavors, "is primarily concerned with domestic conditions," *ibid.* (quoting *Foley Bros., Inc.* v. *Filardo,* 336 U. S. 281, 285 (1949)). See also *Small, post,* at 388 (interpreting the phrase "convicted in any court," 18 U. S. C. § 922(g)(1), in light of the "commonsense notion" that Congress ordinarily intends statutes to have only domestic application (quoting *Smith* v. *United States,* 507 U. S. 197, 204, n. 5 (1993))). Absent a clear statement of "the affirmative intention of the Congress," *Benz* v. *Compania Naviera Hidalgo, S. A.,* 353 U. S. 138, 147 (1957), this Court ordinarily does not read statutes to reach conduct that is "the primary concern of a foreign country," *Foley Bros.,* 336 U. S., at 286; cf. *F. Hoffmann-La Roche Ltd* v. *Empagran*

---

[6] I note that, on the Court's interpretation, federal prosecutors could resort to the wire and mail fraud statutes to reach schemes to evade not only foreign taxes, but state and local taxes as well.

[7] I do not read into § 1343's coverage of frauds executed "in interstate or foreign commerce," *ante,* at 371–372, congressional intent to give § 1343 extraterritorial effect. A statute's express application to acts committed in foreign commerce, the Court has repeatedly held, does not in itself indicate a congressional design to give the statute extraterritorial effect. See *ARAMCO,* 499 U. S. 244, 250–253 (1991).

*S. A.*, 542 U. S. 155, 164 (2004) (referring to presumption that "legislators take account of the legitimate sovereign interests of other nations when they write American laws").

Section 1343, which contains no reference to foreign law as an element of the domestic crime of wire fraud, contrasts with federal criminal statutes that chart the courts' course in this regard. See, *e. g.*, 18 U. S. C. § 1956(c)(1) (defendant must know that transaction involved the proceeds of activity "that constitutes a felony under State, Federal, or foreign law"); 16 U. S. C. § 3372(a)(2)(A) (banning importation of wildlife that has been "taken, possessed, transported, or sold in violation of any . . . foreign law"). These statutes indicate that Congress, which has the sole authority to determine the extraterritorial reach of domestic laws, is fully capable of conveying its policy choice to the Executive and the courts. I would not assume from legislative silence that Congress left the matter to executive discretion.[8]

The presumption against extraterritoriality, which guides courts in the absence of congressional direction, provides ample cause to conclude that § 1343 does not extend to the instant scheme. Moreover, as to foreign customs and tax laws, there is scant room for doubt about Congress' general

---

[8] The application of 18 U. S. C. § 1343 (2000 ed., Supp. II) to schemes to defraud a foreign individual or corporation, or even a foreign governmental entity acting as a market participant, is of a different order, and does not necessarily depend on any determination of foreign law. As the Court of Appeals observed in *United States* v. *Boots*, 80 F. 3d 580, 587 (CA1 1996), upholding a defendant's wire fraud conviction in a case like the one here presented "would amount functionally to penal enforcement of Canadian customs and tax laws." See also *ibid.* (noting that courts "will enforce foreign non-tax civil judgments unless due process, jurisdictional, or fundamental public policy considerations interfere" (citing Restatement (Third) of Foreign Relations Law of the United States § 483, and Reporters' Notes, n. 1 (1986)), but "[o]ur courts customarily refuse to enforce the revenue and penal laws of a foreign state, since no country has an obligation to further the governmental interests of a foreign sovereign" (quoting *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398, 448 (1964) (White, J., dissenting))).

perspective: Congress has actively indicated, through both domestic legislation and treaties, that it intends "strictly [to] limit the parameters of any assistance given" to foreign nations. *Attorney General of Canada* v. *R. J. Reynolds Tobacco Holdings, Inc.*, 268 F. 3d, at 119; see also *United States* v. *Boots*, 80 F. 3d 580, 588 (CA1 1996) ("National [foreign] policy judgments . . . could be undermined if federal courts were to give general effect to wire fraud prosecutions for . . . violating the revenue laws of any country.").

First, Congress has enacted a specific statute criminalizing offenses of the genre committed by the defendants here: 18 U. S. C. § 546 prohibits transporting goods "into the territory of any foreign government in violation of the laws there in force." Section 546's application, however, is expressly conditioned on the foreign government's enactment of reciprocal legislation prohibiting smuggling into the United States. See *ibid.* (prohibition applies "if under the laws of such foreign government any penalty or forfeiture is provided for violation of the laws of the United States respecting the customs revenue"). The reciprocity limitation reflects a legislative determination that this country should not provide other nations with greater enforcement assistance than they give to the United States. The limitation also cabins the Government's discretion as to which nation's customs laws to enforce, thereby avoiding the appearance of prosecutorial overreaching. See 305 F. 3d 291, 297, n. 9 (CA4 2002) (Gregory, J.) ("Where do we draw the line as to which countries' laws we will help enforce?"), vacated and reh'g en banc granted, 2003 U. S. App. LEXIS 585, *1 (CA4, Jan. 14, 2003). Significantly, Canada has no statute criminalizing smuggling into the United States, rendering § 546 inapplicable to schemes resembling the one at issue here.[9]

---

[9] Section 546's requirement that a vessel have been used to transport the goods to the foreign country would render § 546 inapplicable to these defendants' conduct in any event.

Second, the United States and Canada have negotiated, and the Senate has ratified, a comprehensive tax treaty, in which both nations have committed to providing collection assistance with respect to each other's tax claims. See Protocol Art. 15. Significantly, the Protocol does not call upon either nation to interpret or calculate liability under the other's tax statutes; it applies only to tax claims that have been fully and finally adjudicated under the law of the requesting nation. Further, the Protocol bars assistance in collecting any claim against a citizen or corporation of "the requested State." *Id.*, at 246, Art. 15, ¶ 8(a). These provisions would preclude Canada from obtaining United States assistance in enforcing its claims against the Pasquantinos and Hilts. I would not assume that Congress understood § 1343 to provide the assistance that the United States, in the considered foreign policy judgment of both political branches, has specifically declined to promise.

## II

Complementing the principle that courts ordinarily should await congressional instruction before giving our laws extraterritorial thrust, the common-law revenue rule holds that one nation generally does not enforce another's tax laws. See *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398, 448 (1964) (White, J., dissenting) (noting that "our courts customarily refuse to enforce the revenue and penal laws of a foreign state"); cf. *Milwaukee County* v. *M. E. White Co.*, 296 U. S. 268, 275–276 (1935). The Government argues, and the Court accepts, that domestic wire fraud prosecutions premised on violations of foreign tax law do not implicate the revenue rule because the court, while it must "recognize foreign [revenue] law to determine whether the defendant violated U. S. law," *ante*, at 369, need only "enforce" foreign law "in an attenuated sense." See *ante*, at 366; Brief for United States 17–19. As discussed above, however, the defendants' conduct arguably fell within the scope of § 1343 only because

of their purpose to evade Canadian customs and tax laws; shorn of that purpose, no other aspect of their conduct was criminal in this country. See *supra*, at 375–377; *Boots*, 80 F. 3d, at 587 ("[U]pholding defendants' section 1343 conviction would amount . . . to penal enforcement of Canadian customs and tax laws."). It seems to me unavoidably obvious, therefore, that this prosecution directly implicates the revenue rule. It is equally plain that Congress did not endeavor, by enacting § 1343, to displace that rule.

The application of the Mandatory Victims Restitution Act of 1996, 18 U. S. C. § 3663A, to wire fraud offenses is corroborative. Section 3663A applies to all "offense[s] against property," § 3663A(c)(1)(A)(ii), and directs that "[n]otwithstanding any other provision of law . . . the court *shall* order . . . that the defendant make restitution to the victim of the offense," § 3663A(a)(1) (emphasis added). The Government acknowledges, however, that it "did not urge the district court to order restitution in this case on the theory that it was not 'appropriate . . . since the victim is a foreign government and the loss derives from tax laws of the foreign government.'" Brief for United States 19–20 (quoting Letter from United States Attorney S. Schenning to United States District Chief Judge J. Motz, Feb. 16, 2001, App. 106). The Government now disavows this concession. See Tr. of Oral Arg. 36 (While "the prosecutor did concede below that restitution was not appropriately ordered," it is in fact "[t]he position of the United States . . . that restitution under the mandatory statute should be ordered and it does not infringe the revenue rule."). Nevertheless, the very fact that the Government effectively invited the District Court to overlook the mandatory restitution statute out of concern for the revenue rule is revealing. It further demonstrates that the Government's expansive reading of § 1343 warrants this Court's disapprobation.

Any tension between § 3663A and the wire fraud statute, the Government suggests and the Court accepts, would be

relieved if this Court construed § 3663A to exclude restitution that might encounter a revenue rule shoal. See *ante*, at 365; Brief for United States 21. Congress, however, has expressed with notable clarity a policy of mandatory restitution in *all* wire fraud prosecutions. In contrast, Congress was "quite ambiguous" concerning § 1343's coverage of schemes to evade foreign taxes. Tr. of Oral Arg. 38. The Mandatory Victims Restitution Act, in my view, is an additional indicator that "Congress . . . [did not] envision foreign taxes to be the object of [a] scheme to defraud," *id.*, at 35–36, and I would construe § 1343 accordingly.

## III

Finally, the rule of lenity counsels against adopting the Court's interpretation of § 1343. It is a "close question" whether the wire fraud statute's prohibition of "any scheme . . . to defraud" includes schemes directed solely at defrauding foreign governments of tax revenues. See *id.*, at 33. We have long held that, when confronted with "two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *McNally*, 483 U. S., at 359–360; see *United States* v. *Universal C. I. T. Credit Corp.*, 344 U. S. 218, 221–222 (1952).

This interpretive guide is particularly appropriate here. Wire fraud is a predicate offense under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. § 1961(1) (2000 ed., Supp. II), and the money laundering statute, § 1956(c)(7)(A) (2000 ed.). See *Cleveland*, 531 U. S., at 25. A finding that particular conduct constitutes wire fraud therefore exposes certain defendants to the severe criminal penalties and forfeitures provided in both RICO, see § 1963 (2000 ed.), and the money laundering statute, § 1956(a), (b) (2000 ed. and Supp. II).

\* \* \*

For the reasons stated, I would hold that § 1343 does not extend to schemes to evade foreign tax and customs laws. I would therefore reverse the judgment of the Court of Appeals.