Justice Breyer,
with whom Justice Stevens and Justice Kennedy join, dissenting.
In my view, the Hemi Group’s failure to provide New York State with the names and addresses of its New York City cigarette customers proximately caused New York City to lose tobacco tax revenue. I dissent from the Court’s contrary holding.
I
A
Although the ultimate legal issue is a simple one, the statutory framework within which it arises is complex. As the majority points out, ante, at 6, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. §§ 1961-1968, provides a private cause of action (and treble damages) to “[a]ny person injured in” that person’s “business or property by reason of ” conduct that involves a “pattern of racketeer *20 ing activity.” §§ 1964(c) (emphasis added), 1962. RICO defines “racketeering activity” to include violations of various predicate criminal statutes including mail and wire fraud. § 1961(1). The “pattern of racketeering” at issue here consists of repeated instances of mail fraud, which in ton consist largely of violations of the federal Jenkins Act, 15 U. S. C. §§375-378. That Act seeks to help States collect tobacco taxes by requiring out-of-state cigarette sellers, such as Hemi, to file reports with state tobacco tax administrators identifying the names and addresses of in-state customers and the amounts they purchased. The violations consist of Hemi’s intentional failure to do so.
As the majority points out, we must assume for present purposes that an intentional failure to file Jenkins Act reports counts as mail fraud (at least where the failure is part of a scheme that includes use of the mails). Ante, at 7. Lower courts have sometimes so held. See United States v. Melvin, 544 F. 2d 767, 773-777 (CA5 1977); United States v. Brewer, 528 F. 2d 492, 497-498 (CA4 1975). The Court of Appeals here so held. New York v. Smokes-Spirits.com, Inc., 541 F. 3d 425, 446 (CA2 2008). And no one has challenged that holding.
We must also assume that Hemi’s “intentiona[l] conceal[ment]” of the name/address/purchase information, Second Amended Compl. ¶¶ 103, 104, is the legal equivalent of an affirmative representation that Hemi had no New York City customers. See 3 Restatement (Second) of Torts §551, p. 119 (1976) (a person “who fails to disclose ... a fact” may be “subject to . . . liability” as if “he had represented the nonexistence of the matter that he has failed to disclose”); cf. Stewart v. Wyoming Cattle Ranche Co., 128 U. S. 383, 388 (1888) (concealment or suppression of material fact equivalent to a false representation). On these assumptions, the question before us is whether New York City’s loss of tax revenues constitutes an injury to its “business or property by reason of” Hemi’s Jenkins Act misrepresentations.
*21 B
The case arises as a result of the District Court’s dismissal of New York City’s RICO complaint. Fed. Rule Civ. Proc. 12(b)(6). Hence we must answer the question in light of the facts alleged, taking as true the facts pleaded in the complaint (along with the “RICO statement” submitted pursuant to the District Court’s rule). Bridge v. Phoenix Bond & Indemnity Co., 553 U. S. 639, 642, n. 1 (2008). Those facts (as I interpret them) include the following:
1. New York State (or State) and New York City (or City) both impose tobacco taxes on New York cigarette buyers. Second Amended Compl. ¶ 37.
2. Both City and State normally collect the taxes from instate cigarette sellers, who, in turn, charge retail customers. Id., ¶¶4,6.
3. Hemi, an out-of-state company, sells cigarettes over the Internet to in-state buyers at prices that are lower than in-state cigarette prices. The difference in price is almost entirely attributable to the fact that Hemi’s prices do not include any charge for New York taxes. Hemi advertises its cigarettes as “tax free” and often adds that it “does not report any sales activity to any State taxing authority.” Id., ¶¶ 2,6,108b (emphasis deleted).
4. New York State normally receives Jenkins Act reports from out-of-state sellers. It is contractually obliged to pass the information on to New York City (and I assume it normally does so). Id., ¶¶8-9,11, 54-57.
5. When it receives Jenkins-Act-type information, New York City writes letters to resident customers asking them to pay the tobacco tax they owe. As a result, New York City collects about 40% of the tax due. (By doing so, in 2005 the City obtained $400,000 out of $1 million owed.) Id., ¶¶ 58-59.
6. Hemi has consistently and intentionally failed to file Jenkins Act reports in order to prevent both State and *22 City from collecting the tobacco taxes that Hemi’s instate customers owe and which otherwise many of those customers would pay. Id., ¶¶ 13, 24, 58.
II
A
The majority asks whether New York City stated a valid cause of action in alleging that it lost tobacco tax revenue “by reason of” Hemi’s unlawful misrepresentations. The facts just set forth make clear that we must answer that question affirmatively. For one thing, no one denies that Hemi’s misrepresentation was a “but-for” condition of New York City’s loss. In the absence of the misrepresentation, i. e., had Hemi told New York State the truth about its New York City customers, New York City would have written letters to the purchasers and obtained a significant share of the tobacco taxes buyers owed.
For another thing, New York City’s losses are “reasonably foreseeable” results of the misrepresentation. It is foreseeable that, without the name/address/purchase information, New York City would not be able to write successful dunning letters, and it is foreseeable that, with that information, it would be able to write successful dunning letters. Indeed, that is a natural inference from, among other things, the complaint’s assertion that Hemi advertised that it did not “report” sales information to “State taxing authorit[ies].” See, e. g., Smith v. Bolles, 132 U. S. 125, 130 (1889) (for causation purposes, “'those results are proximate which the wrong-doer from his position must have contemplated as the probable consequence of his fraud or breach of contract’” (quoting Crater v. Binninger, 33 N. J. L. 513, 518 (Ct. Errors and Appeals 1869))); see also W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 110, p. 767 (5th ed. 1984) (hereinafter Prosser and Keeton); 3 S. Speiser, C. Krause, & A. Cans, The American Law of Torts § 11:3, p. 68 (2008) (“By far the most treated and most *23 discussed aspect of the law of proximate or legal cause is the so-called doctrine of foreseeability”). But cf. ante, at 12 (“The dissent would have RICO’s proximate cause requirement turn on foreseeability ... ”).
Further, Hemi misrepresented the relevant faets in order to bring about New York City’s relevant loss. It knew the loss would occur; it intended the loss to occur; one might even say it desired the loss to occur. It is difficult to find common-law cases denying liability for a wrongdoer’s intended consequences, particularly where those consequences are also foreseeable. Cf. Bridge, supra, at 649-650 (“[Suppose an enterprise that wants to get rid of rival businesses mails representations about them to their customers and suppliers, but not to the rivals themselves. If the rival businesses lose money as a result of the misrepresentations, it would certainly seem that they were injured in their business ‘by reason of’ a pattern of mail fraud . . . ”); N. M. ex rel. Caleb v. Daniel E., 2008 UT 1, ¶ 7, n. 3, 175 P. 3d 566, 569, n. 3 (“[I]f an unskilled marksman were to shoot a single bullet at a distant individual with the intent of killing her, that individual’s injury or death may not be the natural and probable consequence of the [shooter’s] act[,] . . . [but] the harm would not be an accident because the shooter intended the harm, even though the likelihood of success was improbable”); 1 F. Harper & F. James, Law of Torts §7.13, p. 584 (1956) (explaining that, ordinarily, “all intended consequences” of an intentional act “are proximate”).
In addition, New York City’s revenue loss falls squarely within the bounds of the kinds of harms that the Jenkins Act (essentially the predicate statute) seeks to prevent. The statute is entitled “AN ACT To assist States in collecting sales and use taxes on cigarettes.” Ch. 699, 63 Stat. 884. I have no reason to believe the Act intends any different result with respect to collection of a city’s tobacco tax assessed under the authority of state law. See N. Y. Unconsol. Law Ann. § 9436(1) (West Supp. 2009) (authorizing cities with *24 over 1 million inhabitants to impose their own cigarette taxes). The Restatement (Second) of Torts explains that where
“a statute requires information to be furnished ... for the protection of a particular class of persons, one who makes a fraudulent misrepresentation ... is subject to liability to the persons for pecuniary loss ... in a transaction of the kind in which the statute is intended to protect them.” 3 Restatement §536, at 77 (1976).
See also 4 id, § 536, Appendix (citing supporting cases in the Reporter’s Note).
Finally, we have acknowledged that “Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws,” and we have therefore looked to those laws as an interpretive aid in RICO cases. Holmes v. Securities Investor Protection Corporation, 503 U. S. 258, 267, 268 (1992). I can find no antitrust analogy that suggests any lack of causation here, nor has the majority referred to any such analogical antitrust circumstance.
The upshot is that the harm is foreseeable; it is a consequence that Hemi intended, indeed desired; and it falls well within the set of risks that Congress sought to prevent. Neither antitrust analogy nor any statutory policy of which I am aware precludes a finding of “proximate cause.” I recognize that some of our opinions may be read to suggest that the words “by reason of” in RICO do not perfectly track common-law notions of proximate cause. See, e. g., Bridge, 553 U. S., at 655-657. But where so much basic common law argues in favor of such a finding, how can the Court avoid that conclusion here?
B
The majority bases its contrary conclusion upon three special circumstances and its reading of two of this Court’s prior cases. In my view, none of the three circumstances precludes finding causation (indeed two are not even rele *25 vant to the causation issue). Nor can I find the two prior cases controlling.
The three circumstances are the following: First, the majority seems to argue that the intervening voluntary acts of third parties, namely, the customers’ own independent failures to pay the tax, cuts the causal chain. Ante, at 11 (“[T]he City’s harm was directly caused by the customers, not Hemi”); see Saugerties Bank v. Delaware & Hudson Co., 236 N. Y. 425, 430, 141 N. E. 904, 905 (1923) (third party’s forgery of a bill of lading an intervening cause); Prosser and Keeton §44, at 313-314 (collecting cases on intervening intentional or criminal acts). But an intervening third-party act, even if criminal, does not cut a causal chain where the intervening act is foreseeable and the defendant’s conduct increases the risk of its occurrence. See Lillie v. Thompson, 332 U. S. 459, 462 (1947) (per curiam); Horan v. Watertown, 217 Mass. 185, 186, 104 N. E. 464, 465 (1914); see also 2 Restatement (Second) of Torts §435A, at 454 (1963-1964) (intentional tortfeasor liable for intended harm “except where the harm results from an outside force the risk of which is not increased by the defendant’s act”). Hemi’s act here did increase the risk that New York City would not be paid; and not only was the risk foreseeable, but Hemi’s advertising strongly suggests that Hemi actually knew non-reporting would likely bring about this very harm.
The majority elaims that “directness,” rather than foreseeability, should be our guide in assessing proximate cause, and that the lack of a “direct” relationship in this case precludes a finding of proximate causation. Ante, at 12. But courts used this concept of directness in tort law to expand liability (for direct consequences) beyond what was foreseeable, not to eliminate liability for what was foreseeable. Thus, under the “directness” theory of proximate causation, there is liability for both “all ‘direct’ (or ‘directly traceable’) consequences and those indirect consequences that are foreseeable.” Prosser and Keeton §42, at 273 (emphasis added); *26 see also id., § 43, at 294, and n. 17 (citing Nunan v. Bennett, 184 Ky. 591, 212 S. W. 570 (1919)). I do not read this Court’s opinions in Holmes or Anza v. Ideal Steel Supply Corp., 547 U. S. 451 (2006), to invoke anything other than this traditional understanding.
Second, the majority correctly points out that Hemi misrepresented the situation to the State, not to the City — a circumstance which, the majority believes, significantly separates misrepresentation from harm. Ante, at 11. But how could that be so? New York State signed a contract promising to relay relevant information to the City. In respect to that relevant information, the State is a conduit, indeed roughly analogous to a postal employee. This Court has recognized specifically that “under the common law a fraud may be established when the defendant has made use of a third party to reach the target of the fraud.” Tanner v. United States, 483 U. S. 107, 129 (1987). The treatises say the same. See, e. g., Prosser and Keeton § 107, at 743-745; 26 C. J. S., Fraud §47, p. 1121 (1921) (collecting cases); see also Prosser, Misrepresentation and Third Parties, 19 Vand. L. Rev. 231, 240-241, and nn. 56-59, 62-64 (1966) (collecting cases). This Court has never suggested the contrary, namely, that a defendant is not liable for (foreseeable) harm (intentionally) caused to the target of a scheme to defraud simply because the misrepresentation was transmitted via a third (or even a fourth or fifth) party. Cf. Terry, Intent To Defraud, 25 Yale L. J. 87, 93 (1915) (“When a representation is communicated through one person to another in such circumstances that it can be deemed to be directed to the latter, it makes no difference through how many persons or by how circuitous a route it reaches the latter ...”).
Third, the majority places great weight upon its view that Hemi tried to defraud the State, not the City. Ante, at 11. Hemi, however, sought to defraud both. Third Amended RICO Statement ¶ d (explaining that “[e]very other State or local government that imposes a use tax on cigarettes and *27 whose residents purchase cigarettes” from Hemi is a victim of its scheme to defraud). Hemi sought to prevent the State from collecting state taxes; and it sought to prevent the City from collecting city taxes. Here we are concerned only with the latter. In respect to the latter, the State was an information conduit. The fact that state taxes were also involved is beside the point.
The two Supreme Court cases to which the majority refers involve significantly different causal circumstances. Ante, at 8-11. The predicate acts in Holmes — the defendant’s acts that led to the plaintiff’s harm — consisted of securities frauds. The defendant misrepresented the prospects of one company and misled the investing public into falsely believing that it could readily buy and sell the stock of another. When the truth came out, stock prices fell, investors (specifically, stockbrokers) lost money, and since the stockbrokers could not pay certain creditors, those creditors also lost money. 503 U. S., at 262-263. Claiming subrogation to stand in the shoes of the creditors, the Securities Investor Protection Corporation sued. Id., at 270-271.
Since the creditors had not bought the securities, there was little reason to believe the defendant intended their harm. And the securities statutes seek, first and foremost, to protect investors, not creditors of those who sell stock to those investors. The latter harm (a broker’s creditor’s loss) differs in kind from the harm that the “predicate act” statute primarily seeks to avoid and that its violation would ordinarily cause (namely, investors’ stock-related monetary losses). As Part II-A, supra, points out, neither of these circumstances is present here.
In Anza, the plaintiff was a business competitor of the defendants. The plaintiff claimed that the defendants falsely told state officials that they did not owe sales tax. The plaintiff added that, had the defendants paid the tax they owed, the defendants would have had less money available to run their business, and the plaintiff consequently would *28 have been able to compete against them more effectively. 547 U. S., at 454, 457-458.
Again, in Anza the kind of harm that the plaintiff alleged is not the kind of harm that the tax statutes primarily seek to prevent. Rather, it alleged a kind of harm (competitive injury) that tax violations do not ordinarily cause and which ordinarily flows from the regular operation of a competitive marketplace. Thus, in both Holmes and Anza, unlike the present case, plaintiffs alleged special harm, neither squarely within the class of harms at which the relevant statutes were directed, nor of a kind that typical violators would intend or even foresee.
Bridge, which the majority seeks to distinguish, ante, at 14-15, is a more closely analogous ease. The defendants in that case directed agents to misrepresent to a county that they qualified as independent bidders at a county-run property auction. They consequently participated in the auction. And the plaintiffs, facing additional bidders, lost some of the property that they otherwise would have won — all to their financial disadvantage. 553 U. S., at 643-644. The harm was foreseeable; it was intended; and it was precisely the kind of harm that the county’s bidding rules sought to prevent. Thus this Court held that the harm was “a foreseeable and natural consequence of [the defendants’] scheme.” Id., at 658.
In sum, the majority recognizes that “[p]roximate cause for RICO purposes . . . should be evaluated in light of its common-law foundations,” ante, at 9, but those foundations do not support the majority’s view. Moreover, the majority’s rationale would free from RICO liability defendants who would appear to fall within its intended scope. Consider, for example, a group of defendants who use a marketing firm (in RICO terms, an “enterprise”) to perpetrate a variation on a “pump and dump” scheme. See, e. g., United States v. Salmonese, 352 F. 3d 608, 612 (CA2 2003). They deliberately and repeatedly make egregiously fraudulent misrepre *29 sentations to inflate the price of securities that, unbeknownst to investors, they own. After the stock price rises, the defendants sell at an artificial profit. When the fraud is revealed, the price crashes, to the investors’ detriment. Suppose the defendants have intentionally spoken directly only to intermediaries who simply repeated the information to potential investors, and have not had any contact with the investors themselves. Under the majority’s reasoning, these defendants apparently did not proximately cause the investors’ losses and are not liable under RICO.
III
If there is causation, we must decide whether, for RICO purposes, the City’s loss of tax revenue is “ ‘business or property’ under 18 U. S. C. § 1964(c).” Ante, at 8 (acknowledging, but not reaching, this second issue). The question has led to concern among the lower courts. Some fear that an affirmative answer would turn RICO into a tax collection statute, permitting States to bring RICO actions and recover treble damages for behavior that amounts to no more than a failure to pay taxes due. See, e. g., Michigan, Dept. of Treasury, Revenue Div. v. Fawaz, No. 86-1809, 1988 WL 44736, *2 (CA6 1988) (holding that tax revenue is not RICO “property” lest district courts become “collection agencies for unpaid state taxes”); Illinois Dept. of Revenue v. Phillips, 771 F. 2d 312, 316, 312 (CA7 1985) (holding, “reluctantly,” that “a state’s Department of Revenue may file suit in federal court for treble damages under [RICO] against a retailer who files fraudulent state sales tax returns”).
In a related context, however, the Department of Justice has taken steps to avoid the “tax collection agency” problem without reading all tax-related frauds out of similar federal criminal statutes. The Department’s prosecution guidelines require prosecutors considering a tax-related mail fraud or wire fraud or bank fraud prosecution (or a related RICO prosecution) to obtain approval from high-level Department *30 officials. And those guidelines specify that the Department will grant that approval only where there is at issue “a large fraud loss or a substantial pattern of conduct” and will not do so, absent “unusual circumstances,” in cases involving simply “one person’s tax liability.” Dept. of Justice, United States Attorneys’ Manual §6-4.210(A) (2007), online at http://www.justice.gov/usao/eousa/foia_reading_room/ usam/title6/4mtax.htm (as visited Jan. 20,2010, and available in Clerk of Court’s case file); see also §6-4.210(B) (explaining that the Department “will not authorize the use of mail, wire or bank fraud charges to convert routine tax prosecutions into RICO ... cases”).
This case involves an extensive pattern of fraudulent conduct, large revenue losses, and many different unrelated potential taxpayers. The Department’s guidelines would appear to authorize prosecution in these circumstances. And limiting my consideration to these circumstances, I would find that this RICO complaint asserts a valid harm to “business or property.” I need not and do not express a view as to how or whether RICO’s civil action provisions apply to simpler instances of individual tax liability.
This conclusion is virtually compelled by Pasquantino v. United States, 544 U. S. 349 (2005), a case that we decided only five years ago. We there pointed out that the right to uncollected taxes is an “entitlement to collect money . . . , the possession of which is ‘something of value.’ ” Id., at 355 (quoting McNally v. United States, 483 U. S. 350, 358 (1987)). Such an entitlement “has long been thought to be a species of property.” 544 U. S., at 356 (citing 3 W. Blackstone, Commentaries on the Laws of England 153-155 (1768)). And “fraud at common law included a scheme to deprive a victim of his entitlement to money.” 544 U. S., at 356. We observed that tax evasion “inflict[s] an economic injury no less than” the “embezzle[ment] [of] funds from the ... treasury.” Ibid. And we consequently held that “Canada’s right to uncollected excise taxes on the liquor petitioners imported into *31 Canada” is “ ‘property’ ” within the terms of the mail fraud statute. Id., at 355.
Hemi points in reply to our decision in Hawaii v. Standard Oil Co. of Cal., 405 U. S. 251 (1972). But that case involved not a loss of tax revenues, but “injury to the general economy of a State” — insofar as it was threatened by violations of antitrust law. Id., at 260. Hawaii’s interest, both more general and derivative of harm to individual businesses, differs significantly from the particular tax loss at issue in Pasquantino and directly at issue here.
We have previously made clear that the compensable injury for RICO purposes is the harm caused by the predicate acts. See generally Sedima, S. P. R. L. v. Imrex Co., 473 U. S. 479, 495-496 (1985); cf. Cleveland v. United States, 531 U. S: 12, 25 (2000). I can find no convincing reason in the context of this case to distinguish in the circumstances present here between “property” as used in the mail fraud statute and “property” as used in RICO. Hence, I would postpone for another day the question whether RICO covers instances where little more than the liability of an individual taxpayer is at issue. And I would find in the respondent’s favor here.
With respect, I dissent.