(Slip Opinion) OCTOBER TERM, 2009 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HEMI GROUP, LLC, ET AL. *v.* CITY OF NEW YORK, NEW YORK

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 08–969.   Argued November 3, 2009—Decided January 25, 2010

Respondent New York City taxes the possession of cigarettes. Petitioner Hemi Group, based in New Mexico, sells cigarettes online to residents of the City. Neither state nor city law requires out-of-state sellers such as Hemi to charge, collect, or remit the City's tax; instead, the City must recover its tax on out-of-state sales directly from the purchasers. But the Jenkins Act, 15 U. S. C. §§375–378, requires out-of-state sellers to submit customer information to the States into which they ship cigarettes, and New York State has agreed to forward that information to the City. That information helps the City track down cigarette purchasers who do not pay their taxes. Against that backdrop, the City filed this lawsuit under the Racketeer Influenced and Corrupt Organizations Act (RICO), alleging that Hemi's failure to file the Jenkins Act reports with the State constituted mail and wire fraud, which are defined as "racketeering activit[ies]," 18 U. S. C. §1961(1), subject to enforcement under civil RICO, §1964(c). The District Court dismissed the claims, but the Second Circuit vacated the judgment and remanded. Among other things, the Court of Appeals held that the City's asserted injury—lost tax revenue—came about "by reason of" the predicate mail and wire frauds. It accordingly determined that the City had stated a valid RICO claim.

*Held:* The judgment is reversed, and the case is remanded.

541 F. 3d 425, reversed and remanded.

CHIEF JUSTICE ROBERTS delivered the opinion of the Court in part, concluding that because the City cannot show that it lost tax revenue "by reason of" the alleged RICO violation, it cannot state a RICO claim. Pp. 5–15.

(a) To establish that an injury came about "by reason of" a RICO violation, a plaintiff must show that a predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes* v. *Securities Investor Protection Corporation*, 503 U. S. 258, 268. Proximate cause for RICO purposes should be evaluated in light of its common-law foundations; it thus requires "some direct relation between the injury asserted and the injurious conduct alleged." *Ibid.* A link that is "too remote," "purely contingent," or "indirec[t]" is insufficient. *Id.*, at 271, 274.

The City's causal theory cannot satisfy RICO's direct relationship requirement. Indeed, the causal link here is far more attenuated than the one the Court rejected as "purely contingent" and "too remote" in *Holmes*. *Id.*, at 271. According to the City, Hemi committed fraud by selling cigarettes to city residents and failing to submit the required customer information to the State. Without the reports from Hemi, the State could not pass on the information to the City, even if it had been so inclined. Some of the customers legally obligated to pay the cigarette tax to the City failed to do so. Because the City did not receive the customer information, it could not determine which customers had failed to pay the tax. The City thus could not pursue those customers for payment. The City thereby was injured in the amount of the portion of back taxes that were never collected. As the Court reiterated in *Holmes*, "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step," *id.,* at 271–272, and that "general tendency" applies with full force to proximate cause inquiries under RICO, *e.g., ibid.* Because the City's causation theory requires the Court to move well beyond the first step, that theory cannot satisfy RICO's direct relationship requirement.

The City's claim suffers from the same defect as the RICO claim rejected in *Anza* v. *Ideal Steel Supply Corp.*, 547 U. S. 451, 458–461, where the conduct directly causing the harm was distinct from the conduct giving rise to the fraud, see *id.*, at 458. Indeed, the disconnect between the asserted injury and the alleged fraud in this case is even sharper. In *Anza,* the same party had both engaged in the harmful conduct and committed the fraudulent act. Here, the City's theory of liability rests not just on separate *actions*, but separate actions carried out by separate *parties*. The City's theory thus requires that the Court extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City). Indeed, the fourth-party taxpayers here only caused harm to the City in the first place if they decided not to pay taxes they were legally obligated to pay. Put simply, Hemi's obligation was to file Jenkins Act

reports with the State, not the City, and the City's harm was directly caused by the customers, not Hemi. The Court has never before stretched the causal chain of a RICO violation so far, and declines to do so today. See, *e.g., id.,* at 460–461. Pp. 5–9.

(b) The City attempts to avoid this conclusion by characterizing the violation not merely as Hemi's failure to file Jenkins Act reports with the State, but as a more general systematic scheme to defraud the City of tax revenue. But if the City could escape the proximate-cause requirement merely by alleging that the fraudulent scheme embraced all those indirectly harmed by the alleged conduct, the Court's RICO proximate cause precedent would become a mere pleading rule. That precedent makes clear that "the compensable injury flowing from a [RICO] violation . . . 'necessarily is the harm caused by [the] predicate acts.'" *Anza, supra,* at 457. Because the only fraudulent *conduct* alleged here is a violation of the Jenkins Act, the City must, but cannot, show that Hemi's failure to file the Jenkins Act reports led directly to its injuries.

The City also errs in relying on *Bridge* v. *Phoenix Bond & Indemnity Co.*, 553 U. S. \_\_\_. There, the plaintiffs' causation theory was "straightforward": The causal link in *Bridge* involved a direct and easily identifiable connection between the fraud at issue and the plaintiffs' injury, *id.,* at \_\_\_; the plaintiffs there "were the *only* parties injured by petitioners' misrepresentations," *id.*, at \_\_\_; and there were "no independent factors that account[ed] for [the] injury," *id.,* at \_\_\_. The City's theory in this case is anything but straightforward: Multiple steps separate the alleged fraud from the asserted injury. And in contrast to *Bridge*, where there were "no independent factors that account[ed] for [the plaintiffs'] injury," *id.*, at \_\_\_, here there certainly were: The City's theory of liability rests on the independent actions of third and even fourth parties. Pp. 10–14.

ROBERTS, C. J., delivered the opinion of the Court in part, in which SCALIA, THOMAS, and ALITO, JJ., joined, and in which GINSBURG, J., joined in part. GINSBURG, J., filed an opinion concurring in part and concurring in the judgment. BREYER, J., filed a dissenting opinion, in which STEVENS and KENNEDY, JJ., joined. SOTOMAYOR, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–969

HEMI GROUP, LLC AND KAI GACHUPIN, PETITIONERS *v.* CITY OF NEW YORK, NEW YORK

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[January 25, 2010]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court in part.

The City of New York taxes the possession of cigarettes. Hemi Group, based in New Mexico, sells cigarettes online to residents of the City. Neither state nor city law requires Hemi to charge, collect, or remit the tax, and the purchasers seldom pay it on their own. Federal law, however, requires out-of-state vendors such as Hemi to submit customer information to the States into which they ship the cigarettes.

Against that backdrop, the City filed this lawsuit under the Racketeer Influenced and Corrupt Organizations Act (RICO), alleging that Hemi failed to file the required customer information with the State. That failure, the City argues, constitutes mail and wire fraud, which caused it to lose tens of millions of dollars in unrecovered cigarette taxes. Because the City cannot show that it lost the tax revenue "by reason of" the alleged RICO violation, 18 U. S. C. §1964(c), we hold that the City cannot state a claim under RICO. We therefore reverse the Court of

Appeals' decision to the contrary.

## I

## A

This case arises from a motion to dismiss, and so we accept as true the factual allegations in the City's second amended complaint. See *Leatherman* v. *Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U. S. 163, 164 (1993).

New York State authorizes the City of New York to impose its own taxes on cigarettes. N. Y. Unconsol. Law Ann. §9436(1) (West Supp. 2009). Under that authority, the City has levied a $1.50 per pack tax on each standard pack of cigarettes possessed within the City for sale or use. N. Y. C. Admin. Code §11–1302(a) (2008); see also Record A1016. When purchasers buy cigarettes from in-state vendors, the seller is responsible for charging, collecting, and remitting the tax. N. Y. Tax Law Ann. §471(2) (West Supp. 2009). Out-of-state vendors, however, are not. *Ibid.*; see *City of New York* v. *Smokes-Spirits.com, Inc.*, 541 F. 3d 425, 432–433 (CA2 2008). Instead, the City is responsible for recovering, directly from the customers, use taxes on cigarettes sold outside New York. That can be difficult, as those customers are often reluctant to pay and tough to track down. One way the City can gather information that would assist it in collecting the back taxes is through the Jenkins Act, 63 Stat. 884, as amended by 69 Stat. 627. That Act requires out-of-state cigarette sellers to register and to file a report with state tobacco tax administrators listing the name, address, and quantity of cigarettes purchased by state residents. 15 U. S. C. §§375–378.

New York State and the City have executed an agreement under which both parties undertake to "cooperate fully with each other and keep each other fully and promptly informed with reference to any person or trans-

action subject to both State and City cigarette taxes in-cluding [i]nformation obtained which may result in addi-tional cigarette tax revenue to the State or City provided that the disclosure of that information is permissible under existing laws and agreements." Record A1003. The City asserts that under that agreement, the State for-wards Jenkins Act information to the City. *Id.,* at A998; Second Amended Compl. ¶54. That information helps the City track down purchasers who do not pay their taxes. *Id.*, ¶¶58–59.

Hemi Group is a New Mexico company that sells ciga-rettes online. Hemi, however, does not file Jenkins Act information with the State. The City alleges that this failure has cost it "tens if not hundreds of millions of dollars a year in cigarette excise tax revenue." Record A996. Based on Hemi's failure to file the information with the State, the City filed this federal RICO claim.

B

RICO provides a private cause of action for "[a]ny per-son injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U. S. C. §1964(c). Section 1962, in turn, contains RICO's criminal provisions. Specifically, §1962(c), which the City invokes here, makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." "[R]acketeering activity" is defined to include a number of so-called predicate acts, including the two at issue in this case—mail and wire fraud. See §1961(1).

The City alleges that Hemi's "interstate sale of ciga-rettes and the failure to file Jenkins Act reports identify-ing those sales" constitute the RICO predicate offenses of mail and wire fraud in violation of §1962(c), for which

§1964(c) provides a private cause of action. Record A980. Invoking that private cause of action, the City asserts that it has suffered injury in the form of lost tax revenue—its "business or property" in RICO terms—"by reason of" Hemi's fraud.

Hemi does not contest the City's characterization of the Jenkins Act violations as predicate offenses actionable under §1964(c). (We therefore assume, without deciding, that failure to file Jenkins Act material can serve as a RICO predicate offense.) Instead, Hemi argues that the City's asserted injury—lost tax revenue—is not "business or property" under RICO, and that the City cannot show that it suffered any injury "by reason of" the failure to file Jenkins Act reports.

The District Court dismissed the City's RICO claims, determining that Hemi owner and officer Kai Gachupin did not have an individual duty to file Jenkins Act reports, and thus could not have committed the alleged predicate acts. *City of New York* v. *Nexicon, Inc.*, No. 03 CV 383 (DAB), 2006 WL 647716, *7–*8 (SDNY, Mar. 15, 2006). The District Court therefore held that the City could not establish that Hemi and Gachupin formed an "enterprise" as required to establish RICO liability. *Id.*, at *7–*10. Because it dismissed on that ground, the District Court did not address whether the City's loss of tax revenue constitutes an injury to its "business or property" under §1964, or whether that injury was caused "by reason of" Hemi's failure to file the Jenkins Act reports.

The Second Circuit vacated the District Court's judgment and remanded for further proceedings. The Court of Appeals held that the City had established that Gachupin and Hemi operated as an "enterprise" and that the enterprise committed the predicate RICO acts of mail and wire fraud, based on the failure to file the Jenkins Act material with the State. 541 F. 3d, at 447–448. The court also determined that the City's asserted injury, lost tax reve-

nue, was "business or property" under RICO. *Id.*, at 444–445. And that injury, the court concluded, came about "by reason of" the predicate mail and wire frauds. *Id.*, at 440–444. The City thus had stated a viable RICO claim. Judge Winter dissented on the ground that the alleged RICO violation was not the proximate cause of the City's injury. *Id.*, at 458–461.

Hemi filed a petition for certiorari, asking this Court to determine whether the City had been "directly injured in its 'business or property'" by reason of the alleged mail and wire frauds. Pet. for Cert. i. We granted that petition. 556 U. S. __ (2009).

## II

Though framed as a single question, Hemi's petition for certiorari raises two distinct issues: First, whether a loss in tax revenue is "business or property" under 18 U. S. C. §1964(c); and second, whether the City's asserted injury came about "by reason of" the allegedly fraudulent conduct, as required by §1964(c). We determine that the City cannot satisfy the causation requirement—that any injury the City suffered must be "by reason of" the alleged frauds—and therefore do not decide whether the City's allegations of lost tax revenue constitute an injury to its "business or property."

## A

In *Holmes* v. *Securities Investor Protection Corporation*, 503 U. S. 258 (1992), we set forth the standard of causation that applies to civil RICO claims. In that case, we addressed a RICO claim brought by Securities Investor Protection Corporation (SIPC) against defendants whom SIPC alleged had manipulated stock prices. *Id.,* at 262–263. SIPC had a duty to reimburse customers of certain registered broker-dealers in the event the broker-dealers were unable to meet their financial obligations. *Id.*, at

261. When the conspiracy by the stock manipulators was detected, stock prices collapsed, and two broker-dealers were unable to meet their obligations to their customers. SIPC, as insurer against that loss, ultimately was on the hook for nearly $13 million to cover the customers' claims. The Court held that SIPC could not recover against the conspirators because it could not establish that it was injured "by reason of" the alleged fraud, as that phrase is used in RICO.

We explained that, to state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Id.*, at 268. Proximate cause for RICO purposes, we made clear, should be evaluated in light of its common-law foundations; proximate cause thus requires "some direct relation between the injury asserted and the injurious conduct alleged." *Ibid.* A link that is "too remote," "purely contingent," or "indirec[t]" is insufficient. *Id.*, at 271, 274.

Applying that standard, we rejected SIPC's RICO claim. The alleged conspiracy, we held, directly harmed only the broker-dealers; SIPC's injury, on the other hand, was "purely contingent" on that harm. *Id.*, at 271. The connection between the alleged conspiracy and SIPC's injury was therefore "too remote" to satisfy RICO's direct relationship requirement. *Ibid.*

The City's causal theory is far more attenuated than the one we rejected in *Holmes*. According to the City, Hemi committed fraud by selling cigarettes to city residents and failing to submit the required customer information to the State. Without the reports from Hemi, the State could not pass on the information to the City, even if it had been so inclined. Some of the customers legally obligated to pay the cigarette tax to the City failed to do so. Because the City did not receive the customer information, the City could not determine which customers had failed to pay the

tax. The City thus could not pursue those customers for payment. The City thereby was injured in the amount of the portion of back taxes that were never collected. See Record A996.

But as we reiterated in *Holmes*, "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step." 503 U. S., at 271–272 (quoting *Associated Gen. Contractors of Cal., Inc.* v. *Carpenters,* 459 U. S. 519, 534 (1983), in turn quoting *Southern Pacific Co.* v. *Darnell-Taenzer Lumber Co.*, 245 U. S. 531, 533 (1918), internal quotation marks omitted). Our cases confirm that the "general tendency" applies with full force to proximate cause inquiries under RICO. *Holmes, supra,* at 271–272; see also *Bridge* v. *Phoenix Bond & Indemnity Co.*, 553 U. S. __, __ (2008) (slip op., at 18–19); *Anza* v. *Ideal Steel Supply Corp.*, 547 U. S. 451, 460–461 (2006). Because the City's theory of causation requires us to move well beyond the first step, that theory cannot meet RICO's direct relationship requirement.

Our decision in *Anza, supra,* confirms that the City's theory of causation is far too indirect. There we considered a RICO claim brought by Ideal Steel Supply against its competitor, National Steel Supply. Ideal alleged that National had defrauded New York State by failing to charge and remit sales taxes, and that National was thus able to undercut Ideal's prices. The lower prices offered by National, Ideal contended, allowed National to attract customers at Ideal's expense. *Id.*, at 458.

Finding the link between the fraud alleged and injury suffered to be "attenuated," we rejected Ideal's claim. *Id.*, at 459. "The direct victim of this conduct," we held, was "the State of New York, not Ideal." *Id.*, at 458. "It was the State that was being defrauded and the State that lost tax revenue as a result." *Ibid.* We recognized that Ideal had asserted "its own harms when [National] failed to charge customers for the applicable sales tax." *Ibid.* But the

cause of Ideal's harm was "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Ibid.* The alleged violation therefore had not "led directly to the plaintiff's injuries," and Ideal accordingly had failed to meet RICO's "requirement of a direct causal connection" between the predicate offense and the alleged harm. *Id.*, at 460–461.

The City's claim suffers from the same defect as the claim in *Anza*. Here, the conduct directly responsible for the City's harm was the customers' failure to pay their taxes. And the conduct constituting the alleged fraud was Hemi's failure to file Jenkins Act reports. Thus, as in *Anza*, the conduct directly causing the harm was distinct from the conduct giving rise to the fraud. See *id.*, at 458.

Indeed, the disconnect between the asserted injury and the alleged fraud in this case is even sharper than in *Anza*. There, we viewed the point as important because the same party—National Steel—had both engaged in the harmful conduct and committed the fraudulent act. We nevertheless found the distinction between the relevant acts sufficient to defeat Ideal's RICO claim. Here, the City's theory of liability rests not just on separate *actions*, but separate actions carried out by separate *parties*.

The City's theory thus requires that we extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City). Indeed, the fourth-party taxpayers here only caused harm to the City in the first place if they decided not to pay taxes they were legally obligated to pay. Put simply, Hemi's obligation was to file the Jenkins Act reports with the State, not the City, and the City's harm was directly caused by the customers, not Hemi. We have never before stretched the causal chain of a RICO violation so far, and we decline to do so today. See *id.,* at 460–461; cf. *Associated Gen. Contractors, supra,* at 541, n. 46 (finding no

proximate cause in the antitrust context where the plaintiff's "harm stems most directly from the conduct of persons who are not victims of the conspiracy").

One consideration we have highlighted as relevant to the RICO "direct relationship" requirement is whether better situated plaintiffs would have an incentive to sue. See *Holmes*, *supra,* at 269–270.  The State certainly is better situated than the City to seek recovery from Hemi. And the State has an incentive to sue—the State imposes its own $2.75 per pack tax on cigarettes possessed within the State, nearly double what the City charges.  N. Y. Tax Law Ann. §471(1) (West Supp. 2009).  We do not opine on whether the State could bring a RICO action for any lost tax revenue.  Suffice it to say that the State would have concrete incentives to try.  See *Anza*, *supra,* at 460 ("Ideal accuses the Anzas of defrauding the State of New York out of a substantial amount of money.  If the allegations are true, the State can be expected to pursue appropriate remedies").

The dissent would have RICO's proximate cause requirement turn on foreseeability, rather than on the existence of a sufficiently "direct relationship" between the fraud and the harm.  It would find that the City has satisfied that requirement because "the harm is foreseeable; it is a consequence that Hemi intended, indeed desired; and it falls well within the set of risks that Congress sought to prevent."  *Post*, at 6 (opinion of BREYER, J.).  If this line of reasoning sounds familiar, it should.  It is precisely the argument lodged against the majority opinion in *Anza*. There, the dissent criticized the majority's view for "permit[ting] a defendant to evade liability for harms that are not only foreseeable, but the *intended* consequences of the defendant's unlawful behavior."  547 U. S., at 470 (THOMAS, J., concurring in part and dissenting in part). But the dissent there did not carry the day, and no one has asked us to revisit *Anza*.

The concepts of direct relationship and foreseeability are of course two of the "many shapes [proximate cause] took at common law," *Holmes*, *supra*, at 268. Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm. Indeed, *Anza* and *Holmes* never even mention the concept of foreseeability.

## B

The City offers a number of responses. It first challenges our characterization of the violation at issue. In the City's view, the violation is not merely Hemi's failure to file Jenkins Act information with the State, but a more general "systematic scheme to defraud the City of tax revenue." Brief for Respondent 42. Having broadly defined the violation, the City contends that it has been directly harmed by reason of that systematic scheme. *Ibid.*

But the City cannot escape the proximate cause requirement merely by alleging that the fraudulent scheme embraced all those indirectly harmed by the alleged conduct. Otherwise our RICO proximate cause precedent would become a mere pleading rule. In *Anza*, for example, Ideal alleged that National's scheme "was to give National a competitive advantage over Ideal." 547 U. S., at 454–455. But that allegation did not prevent the Court from concluding that National's fraud directly harmed only the State, not Ideal. As the Court explained, Ideal could not "circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense." *Id.*, at 460.[1]

---

[1] Even if we were willing to look to Hemi's intent, as the dissent suggests we should, the City would fare no better. Hemi's aim was not to defraud the City (or the State, for that matter) of tax revenue, but to sell more cigarettes. Hemi itself neither owed taxes nor was obliged to collect and remit them. This all suggests that Hemi's alleged fraud was

Opinion of the Court

Our precedent makes clear, moreover, that "the compensable injury flowing from a [RICO] violation . . . 'necessarily is the harm caused by [the] predicate acts.'" *Id.,* at 457 (quoting *Sedima, S. P. R. L.* v. *Imrex Co.,* 473 U. S. 479, 497 (1985)). In its RICO statement, the City alleged that Hemi's failure to file Jenkins Act reports constituted the predicate act of mail and wire fraud. Record A980. The City went on to allege that this predicate act "directly caused" its harm, *id.,* at A996, but that assertion is a legal conclusion about proximate cause—indeed, the very legal conclusion before us. The only fraudulent *conduct* alleged here is a violation of the Jenkins Act. See 541 F. 3d, at 459 (Winter, J., dissenting). Thus, the City must show that Hemi's failure to file the Jenkins Act reports with the State led directly to its injuries. This it cannot do.

The City also relies on *Bridge*, 553 U. S. \_\_\_. *Bridge* reaffirmed the requirement that there must be "a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury." *Id.,* at \_\_\_ (slip op., at 18). The case involved competing bidders at a county tax-lien auction. Because the liens were profitable even at the lowest possible bid, multiple bidders offered that low bid. (The bidding took the form of the percentage tax penalty the bidder would require the property owner to pay, so the lowest possible bid was 0%.) To decide which bidder would be awarded the lien, the county devised a plan to allocate the liens "on a rotational basis." *Id.,* at \_\_\_ (slip op., at 3) (internal quotation marks omitted). But as we noted in that case, this created a "perverse incentive": "Bidders who, in addition to bidding themselves, sen[t] agents to bid on their behalf [would] obtain a disproportionate share of liens." *Ibid.* The county therefore

———————

aimed at Hemi's competitors, not the City. But *Anza* teaches that the competitors' injuries in such a case are too attenuated to state a RICO claim.

prohibited bidders from using such agents. *Ibid.*

A losing bidder alleged that a competitor had defrauded the county by employing shadow bidders to secure a greater proportion of liens than it was due. We held that the bidder-plaintiff had met RICO's causation requirement. Distinguishing that claim from the one at issue in *Anza*, we noted that the plaintiff's theory of causation in *Bridge* was "straightforward": Because of the zero-sum nature of the auction, and because the county awarded bids on a rotational basis, each time a fraud-induced bid was awarded, a particular legitimate bidder was necessarily passed over. 553 U. S., at ___ (slip op., at 18). The losing bidders, moreover, "were the *only* parties injured by petitioners' misrepresentations." *Ibid.* The county was not; it received the same revenue regardless of which bidder prevailed.

The City's theory in this case is anything but straightforward: Multiple steps, as we have detailed, separate the alleged fraud from the asserted injury. And in contrast to *Bridge*, where there were "no independent factors that account[ed] for [the plaintiff's] injury," *ibid.,* here there certainly were: The City's theory of liability rests on the independent actions of third and even fourth parties.

The City at various points during the proceedings below described its injury as the lost "opportunity to tax" rather than "lost tax revenue." It is not clear that there is a substantive distinction between the two descriptions. In any event, before this Court, the City's argument turned on lost revenue, not a lost opportunity to collect it. See, *e.g.*, Brief for Respondent *i* ("Counter-Question Presented[:] Does the City of New York have standing under RICO because lost tax revenue constitutes a direct injury to the City's 'business or property' in accord with the statute, 18 U. S. C. §1964(c), and this Court's authority?"); *id.*, at 40 ("[T]he City alleges that it has been injured (the loss of tax revenues) by defendants' RICO violations").

Indeed, in its entire brief on the merits, the City never uses the word "opportunity" (or anything similar) to describe its injury.

Perhaps the City articulated its argument in terms of the lost revenue itself to meet Hemi's contention that an injury to the mere "opportunity to collect" taxes fell short of RICO's injury to "property" requirement. Brief for Petitioners 25 ("The opportunity to collect taxes from those who did owe them . . . falls within a class of expectation interests that do not qualify as injury to business or property and therefore do not confer civil RICO standing" (internal quotation marks omitted)); see *Cleveland* v. *United States*, 531 U. S. 12, 15 (2000) ("It does not suffice . . . that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim").

That is not to say, however, that the City would fare any better on the causation question had it framed its argument in terms of a lost opportunity. Hemi's filing obligation would still be to the State, and any harm to the City would still be caused directly by the customers' failure to pay their taxes. See 541 F. 3d, at 461 (Winter, J., dissenting). Whatever the City's reasons for framing its merits arguments as it has, we will not reformulate them for it now.[2]

--------

[2] The dissent recognizes that its position poses the troubling specter of turning RICO into a tax collection statute. *Post*, at 11–12 (opinion of BREYER, J.). The dissent's answer looks largely to prosecution policy set forth in the Federal Department of Justice Guidelines, which are, of course, not only changeable, but have no applicability whatever to state or local governments. Under the decision below and the dissent's position, RICO could be used as a tax collection device based solely on the failure to file reports under the Jenkins Act, which itself provides quite limited remedies. See 15 U. S. C. §377 (providing that a violation of the Jenkins Act may be punished as a misdemeanor with a fine up to $1,000 and imprisonment for no more than six months). And that

   In a final effort to save its claim, the City has shifted
course before this Court.  In its second amended complaint
and RICO statement, the City relied solely on Hemi's
failure to file Jenkins Act reports with the State to form
the basis of the predicate act mail and wire frauds.  See
Second Amended Compl. ¶¶99, 101, 118, 125; Record
A980–A982.  Before this Court, however, the City con-
tends that Hemi made affirmative misrepresentations to
City residents, which, the City now argues, comprise part
of the RICO predicate mail and wire frauds.  See Brief for
Respondent 42–43.  The City's counsel pressed the point at
oral argument, asserting that the City's injury was
"caused by the seller's misrepresentation, which encour-
ages the purchasers not to pay taxes."  Tr. of Oral Arg. 44.

   The City, however, affirmatively disavowed below any
reliance on misrepresentations to form the predicate RICO
violation.  The alleged false statements, the City there
stated, "are evidence of the scheme to defraud, but are not
part of the fraud itself. . . . [T]he scheme to defraud would
exist even absent the statements."  Record A980.  The City
reiterated the point: "The scheme consists of the interstate
sale of cigarettes and the failure to file Jenkins Act reports
indentifying those sales."  *Ibid.*  "Related to the fraud, but
not a circumstance 'constituting' the fraud, the defendants
inform customers that [their] purchases will be concealed,
and also seek to convince their customers that no taxes are
owed by claiming, falsely, that the sales are tax-free."  *Id.,*
at A982.  Not only did the City disclaim any reliance upon
misrepresentations to the customers to form the predicate
acts under RICO, but the City made clear in its second
amended complaint that its two RICO claims rested solely
on the Jenkins Act violations as the predicate acts.  See

———————
device would be available not only to the State, to which the reports
were due, but also to the City, to which Hemi owed no duty under the
Act and to which it owed no taxes.

Second Amended Compl. ¶¶ 118, 125. Because the City defined the predicate act before the District Court as Hemi's failure to file the Jenkins Act reports, and expressly disavowed reliance on the alleged misrepresentations themselves as predicate acts, we decline to consider Hemi's alleged misstatements as predicate acts at this late stage.

\*    \*    \*

It bears remembering what this case is about. It is about the RICO liability of a company for lost taxes it had no obligation to collect, remit, or pay, which harmed a party to whom it owed no duty. It is about imposing such liability to substitute for or complement a governing body's uncertain ability or desire to collect taxes directly from those who owe them. And it is about the fact that the liability comes with treble damages and attorney's fees attached. This Court has interpreted RICO broadly, consistent with its terms, but we have also held that its reach is limited by the "requirement of a direct causal connection" between the predicate wrong and the harm. *Anza*, 547 U. S., at 460. The City's injuries here were not caused directly by the alleged fraud, and thus were not caused "by reason of" it. The City, therefore, has no RICO claim.

The judgment of the Court of Appeals for the Second Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*


JUSTICE SOTOMAYOR took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

No. 08–969

HEMI GROUP, LLC AND KAI GACHUPIN,
PETITIONERS *v.* CITY OF NEW YORK,
NEW YORK

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[January 25, 2010]

JUSTICE GINSBURG, concurring in part and concurring in
the judgment.

As the Court points out, this is a case "about the RICO
liability of a company for lost taxes it had no obligation to
collect, remit, or pay." *Ante*, at 15. New York City (or
City) cannot, consistent with the Commerce Clause, com-
pel Hemi Group, an out-of-state seller, to collect a City
sales or use tax. See *Quill Corp.* v. *North Dakota*, 504
U. S. 298, 301 (1992); *National Bellas Hess, Inc.* v. *De-
partment of Revenue of Ill.*, 386 U. S. 753, 758 (1967).
Unable to impose its tax on Hemi Group, or to require
Hemi Group to collect its tax, New York City is attempting
to use the Racketeer Influenced and Corrupt Act (RICO),
18 U. S. C. §1964(c), in combination with the Jenkins Act,
15 U. S. C. §§375–378, to overcome that disability.

Hemi Group committed fraud only insofar as it violated
the Jenkins Act by failing to report the names and ad-
dresses of New York purchasers to New York State. There
is no other grounding for the City's charge that it was
defrauded by Hemi Group. "Absent the Jenkins Act,
[Hemi Group] would have owed no duty to disclose [its]
sales to anyone, and [its] failure to disclose could not
conceivably be deemed fraud of any kind." *City of New
York* v. *Smokes-Spirits.com, Inc.*, 541 F. 3d 425, 460 (CA2

2008) (Winter, J., dissenting in part and concurring in part).

Because "the alleged fraud is based on violations of . . . the Jenkins Act, . . . the nature and consequences of the fraud are [properly] determined solely by the scope of that Act." *Id.,* at 459. But "conspicuously absent from the City's pleadings is any claim brought pursuant to the Jenkins Act itself, rather than RICO, seeking enforcement of the Jenkins Act." *Id.,* at 460. The City thus effectively admits that its claim is outside the scope of the very statute on which it builds its RICO suit.

I resist reading RICO to allow the City to end-run its lack of authority to collect tobacco taxes from Hemi Group or to reshape the "quite limited remedies" Congress has provided for violations of the Jenkins Act, see *ante*, at 13, n. 2. Without subscribing to the broader range of the Court's proximate cause analysis, I join the Court's opinion to the extent it is consistent with the above-stated view, and I concur in the Court's judgment.

# SUPREME COURT OF THE UNITED STATES

————

No. 08–969

————

## HEMI GROUP, LLC AND KAI GACHUPIN, PETITIONERS *v.* CITY OF NEW YORK, NEW YORK

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[January 25, 2010]

JUSTICE BREYER, with whom JUSTICE STEVENS and JUSTICE KENNEDY join, dissenting.

In my view, the Hemi Group's failure to provide New York State with the names and addresses of its New York City cigarette customers proximately caused New York City to lose tobacco tax revenue. I dissent from the Court's contrary holding.

I

A

Although the ultimate legal issue is a simple one, the statutory framework within which it arises is complex. As the majority points out, *ante,* at 3, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. §§1961–1968, provides a private cause of action (and treble damages) to "[a]ny person injured in" that person's "business or property *by reason of*" conduct that involves a "pattern of racketeering activity." §§1964(c) (emphasis added), 1962. RICO defines "racketeering activity" to include violations of various predicate criminal statutes including mail and wire fraud. §1961(1). The "pattern of racketeering" at issue here consists of repeated instances of mail fraud, which in turn consist largely of violations of the federal Jenkins Act, 15 U. S. C. §§375–378. That Act

seeks to help States collect tobacco taxes by requiring out-of-state cigarette sellers, such as Hemi, to file reports with state tobacco tax administrators identifying the names and addresses of in-state customers and the amounts they purchased. The violations consist of Hemi's intentional failure to do so.

As the majority points out, we must assume for present purposes that an intentional failure to file Jenkins Act reports counts as mail fraud (at least where the failure is part of a scheme that includes use of the mails). *Ante*, at 4. Lower courts have sometimes so held. See *United States* v. *Melvin*, 544 F. 2d 767, 773–777 (CA5 1977); *United States* v. *Brewer*, 528 F. 2d 492, 497–498 (CA4 1975). The Court of Appeals here so held. *City of New York* v. *Smokes-Spirits.com, Inc.*, 541 F. 3d 425, 446 (CA2 2008). And no one has challenged that holding.

We must also assume that Hemi's "intentiona[l] conceal[ment]" of the name/address/purchase information, Second Am. Compl. ¶¶103, 104, is the legal equivalent of an affirmative representation that Hemi had no New York City customers. See Restatement (Second) of Torts §551, p. 119 (1976) (a person "who fails to disclose . . . a fact" may be "subject to . . . liability" as if "he had represented the nonexistence of the matter that he has failed to disclose"); cf. *Stewart* v. *Wyoming Cattle Ranche Co.*, 128 U. S. 383, 388 (1888) (concealment or suppression of material fact equivalent to a false representation). On these assumptions, the question before us is whether New York City's loss of tax revenues constitutes an injury to its "business or property by reason of" Hemi's Jenkins Act misrepresentations.

## B

The case arises as a result of the District Court's dismissal of New York City's RICO complaint. Fed. Rule Civ. Proc. 12(b)(6). Hence we must answer the question in

light of the facts alleged, taking as true the facts pleaded in the complaint (along with the "RICO statement" submitted pursuant to the District Court's rule). *Bridge* v. *Phoenix Bond & Indemnity Co.*, 553 U. S. \_\_\_, \_\_\_, n. 1 (2008) (slip op., at 1, n. 1). Those facts (as I interpret them) include the following:

1. New York State (or State) and New York City (or City) both impose tobacco taxes on New York cigarette buyers. Second Am. Compl. ¶37.

2. Both City and State normally collect the taxes from in-state cigarette sellers, who, in turn, charge retail customers. *Id.,* ¶¶4, 6.

3. Hemi, an out-of-state company, sells cigarettes over the Internet to in-state buyers at prices that are lower than in-state cigarette prices. The difference in price is almost entirely attributable to the fact that Hemi's prices do not include any charge for New York taxes. Hemi advertises its cigarettes as "tax free" and often adds that it "does not report any sales activity to any State taxing authority." *Id.,* ¶¶2, 6, 108b (internal quotation marks omitted; emphasis deleted).

4. New York State normally receives Jenkins Act reports from out-of-state sellers. It is contractually obliged to pass the information on to New York City (and I assume it normally does so). *Id.,* ¶¶8–9, 11, 54–57.

5. When it receives Jenkins-Act-type information, New York City writes letters to resident customers asking them to pay the tobacco tax they owe. As a result, New York City collects about 40% of the tax due. (By doing so, in 2005 the City obtained $400,000 out of $1 million owed.) *Id.,* ¶¶58–59.

6. Hemi has consistently and intentionally failed to file Jenkins Act reports in order to prevent both State and City from collecting the tobacco taxes that Hemi's in-state customers owe and which otherwise many of those customers would pay. *Id.,* ¶¶13, 24, 58.

## II
### A

The majority asks whether New York City stated a valid cause of action in alleging that it lost tobacco tax revenue "by reason of" Hemi's unlawful misrepresentations. The facts just set forth make clear that we must answer that question affirmatively. For one thing, no one denies that Hemi's misrepresentation was a "but-for" condition of New York City's loss. In the absence of the misrepresentation, *i.e.,* had Hemi told New York State the truth about its New York City customers, New York City would have written letters to the purchasers and obtained a significant share of the tobacco taxes buyers owed.

For another thing, New York City's losses are "reasonably foreseeable" results of the misrepresentation. It is foreseeable that, without the name/address/purchase information, New York City would not be able to write successful dunning letters, and it is foreseeable that, with that information, it would be able to write successful dunning letters. Indeed, that is a natural inference from, among other things, the complaint's assertion that Hemi advertised that it did not "report" sales information to "State taxing authorit[ies]." See, *e.g., Smith* v. *Bolles,* 132 U. S. 125, 130 (1889) (for causation purposes, "'those results are proximate which the wrong-doer from his position must have contemplated as the probable consequence of his fraud or breach of contract'" (quoting *Crater* v. *Binninger,* 33 N. J. L. 513, 518 (Ct. Errors and Appeals 1869)); see also W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts §110, p. 767 (5th ed. 1984) (hereinafter Prosser and Keeton); 3 S. Speiser, C. Krause, & A. Gans, The American Law of Torts §11:3, p. 68 (2003) ("By far the most treated and most discussed aspect of the law of proximate or legal cause is the so-called doctrine of foreseeability"). But cf. *ante,* at 9 ("The dissent would have RICO's proximate cause re-

quirement turn on foreseeability . . .").

Further, Hemi misrepresented the relevant facts *in order to* bring about New York City's relevant loss. It knew the loss would occur; it *intended* the loss to occur; one might even say it *desired* the loss to occur. It is difficult to find common-law cases denying liability for a wrongdoer's intended consequences, particularly where those consequences are also foreseeable. Cf. *Bridge, supra*, at ___–___ (slip op., at 9–10) ("[S]uppose an enterprise that wants to get rid of rival businesses mails representations about them to their customers and suppliers, but not to the rivals themselves. If the rival businesses lose money as a result of the misrepresentations, it would certainly seem that they were injured in their business 'by reason of' a pattern of mail fraud . . ."); *N. M. ex rel. Caleb* v. *Daniel E.*, 2008 UT 1, ¶7, n. 3, 175 P. 3d 566, 569, n. 3 ("[I]f an unskilled marksman were to shoot a single bullet at a distant individual with the intent of killing her, that individual's injury or death may not be the natural and probable consequence of the [shooter's] act[,] . . . [but] the harm would not be an accident because the shooter intended the harm, even though the likelihood of success was improbable"); 1 F. Harper & F. James, The Law of Torts, §7.13, p. 584 (1956) (explaining that, ordinarily, "all intended consequences" of an intentional act "are proximate").

In addition, New York City's revenue loss falls squarely within the bounds of the kinds of harms that the Jenkins Act (essentially the predicate statute) seeks to prevent. The statute is entitled "An Act To assist States in collecting sales and use taxes on cigarettes." 63 Stat. 884. I have no reason to believe the Act intends any different result with respect to collection of a city's tobacco tax assessed under the authority of state law. See N. Y. Unconsol. Law Ann. §9436(1) (West Supp. 2009) (authorizing cities with over one million inhabitants to impose their

own cigarette taxes). The Restatement (Second) of Torts explains that where

> "a statute requires information to be furnished . . . for the protection of a particular class of persons, one who makes a fraudulent misrepresentation . . . is subject to liability to the persons for pecuniary loss . . . in a transaction of the kind in which the statute is intended to protect them." §536, at 77 (1976).

See also §536, Appendix (citing supporting cases in the Reporter's Note).

Finally, we have acknowledged that "Congress modeled §1964(c) on the civil-action provision of the federal antitrust laws," and we have therefore looked to those laws as an interpretive aid in RICO cases. *Holmes* v. *Securities Investor Protection Corporation*, 503 U. S. 258, 267, 268 (1992). I can find no antitrust analogy that suggests any lack of causation here, nor has the majority referred to any such analogical antitrust circumstance.

The upshot is that the harm is foreseeable; it is a consequence that Hemi intended, indeed desired; and it falls well within the set of risks that Congress sought to prevent. Neither antitrust analogy nor any statutory policy of which I am aware precludes a finding of "proximate cause." I recognize that some of our opinions may be read to suggest that the words "by reason of" in RICO do not perfectly track common-law notions of proximate cause. See, *e.g.*, *Bridge*, 553 U. S., at ___–___ (slip op., at 14–16). But where so much basic common law argues in favor of such a finding, how can the Court avoid that conclusion here?

## B

The majority bases its contrary conclusion upon three special circumstances and its reading of two of this Court's prior cases. In my view, none of the three circumstances

precludes finding causation (indeed two are not even relevant to the causation issue). Nor can I find the two prior cases controlling.

The three circumstances are the following: First, the majority seems to argue that the intervening voluntary acts of third parties, namely, the customers' own independent failures to pay the tax, cuts the causal chain. *Ante*, at 8 ("[T]he City's harm was directly caused by the customers, not Hemi"); see *Saugerties Bank* v. *Delaware & Hudson Co.*, 236 N. Y. 425, 430, 141 N. E. 904, 905 (1923) (third party's forgery of a bill of lading an intervening cause); Prosser and Keeton §44, at 313–314 (collecting cases on intervening intentional or criminal acts). But an intervening third-party act, even if criminal, does not cut a causal chain where the intervening act is foreseeable and the defendant's conduct *increases* the risk of its occurrence. See *Lillie* v. *Thompson*, 332 U. S. 459, 462 (1947) *(per curiam); Horan* v. *Watertown*, 217 Mass. 185, 186, 104 N. E. 464, 465 (1914); see also Restatement (Second) of Torts §435A, at 454 (1963–1964) (intentional tortfeasor liable for intended harm "except where the harm results from an outside force the risk of which is not increased by the defendant's act"). Hemi's act here did increase the risk that New York City would not be paid; and not only was the risk foreseeable, but Hemi's advertising strongly suggests that Hemi actually knew nonreporting would likely bring about this very harm.

The majority claims that "directness," rather than foreseeability, should be our guide in assessing proximate cause, and that the lack of a "direct" relationship in this case precludes a finding of proximate causation. *Ante*, at 9–10. But courts used this concept of directness in tort law to expand liability (for direct consequences) *beyond* what was foreseeable, not to eliminate liability for what was foreseeable. Thus, under the "directness" theory of proximate causation, there is liability for both "all 'direct'

(or 'directly traceable') consequences *and those indirect consequences that are foreseeable*." Prosser and Keeton §42, at 273 (emphasis added); see also *id.,* §43, at 294, and n. 17 (citing *Nunan* v. *Bennett*, 184 Ky. 591, 212 S. W. 570 (1919)). I do not read this Court's opinions in *Holmes* or *Anza* v. *Ideal Steel Supply Corp.*, 547 U. S. 451 (2006), to invoke anything other than this traditional understanding.

Second, the majority correctly points out that Hemi misrepresented the situation to the State, not to the City—a circumstance which, the majority believes, significantly separates misrepresentation from harm. *Ante*, at 8. But how could that be so? New York State signed a contract promising to relay relevant information to the City. In respect to that relevant information, the State is a conduit, indeed roughly analogous to a postal employee. This Court has recognized specifically that "under the common law a fraud may be established when the defendant has made use of a third party to reach the target of the fraud." *Tanner* v. *United States*, 483 U. S. 107, 129 (1987). The treatises say the same. See, *e.g.,* Prosser and Keeton §107, at 743–745; 26 C. J. S., Fraud §47, p. 1121 (1921) (collecting cases); see also Prosser, Misrepresentation and Third Parties, 19 Vand. L. Rev. 231, 240–241, and nn. 56–59, 62–64 (1966) (collecting cases). This Court has never suggested the contrary, namely, that a defendant is *not* liable for (foreseeable) harm (intentionally) caused to the target of a scheme to defraud *simply because* the misrepresentation was transmitted via a third (or even a fourth or fifth) party. Cf. Terry, Intent to Defraud, 25 Yale L. J. 87, 93 (1915) ("When a representation is communicated through one person to another in such circumstances that it can be deemed to be directed to the latter, it makes no difference through how many persons or by how circuitous a route it reaches the latter . . .").

Third, the majority places great weight upon its view

that Hemi tried to defraud the State, not the City. *Ante,*
at 8–9. Hemi, however, sought to defraud both. Third
Amended RICO Statement ¶d (explaining that "[e]very
other State or local government that imposes a use tax on
cigarettes and whose residents purchase cigarettes" from
Hemi is a victim of its scheme to defraud). Hemi sought to
prevent the State from collecting state taxes; and it sought
to prevent the City from collecting city taxes. Here we are
concerned only with the latter. In respect to the latter, the
State was an information conduit. The fact that state
taxes were also involved is beside the point.

The two Supreme Court cases to which the majority
refers involve significantly different causal circumstances.
*Ante,* at 5–8. The predicate acts in *Holmes*—the defen-
dant's acts that led to the plaintiff's harm—consisted of
securities frauds. The defendant misrepresented the
prospects of one company and misled the investing public
into falsely believing that it could readily buy and sell the
stock of another. When the truth came out, stock prices
fell, investors (specifically, stockbrokers) lost money, and
since the stockbrokers could not pay certain creditors,
those creditors also lost money. 503 U. S., at 262–263.
Claiming subrogation to stand in the shoes of the credi-
tors, the Securities Investor Protection Corporation sued.
*Id.,* at 270–271.

Since the creditors had not bought the securities, there
was little reason to believe the defendant intended their
harm. And the securities statutes seek, first and foremost,
to protect investors, not creditors of those who sell stock to
those investors. The latter harm (a broker's creditor's
loss) differs in kind from the harm that the "predicate act"
statute primarily seeks to avoid and that its violation
would ordinarily cause (namely, investors' stock-related
monetary losses). As Part II–A, *supra,* points out, neither
of these circumstances is present here.

In *Anza,* the plaintiff was a business competitor of the

defendants.  The plaintiff claimed that the defendants falsely told state officials that they did not owe sales tax. The plaintiff added that, had the defendants paid the tax they owed, the defendants would have had less money available to run their business, and the plaintiff consequently would have been able to compete against them more effectively.  547 U. S., at 454, 457–458.

Again, in *Anza* the *kind of harm* that the plaintiff alleged is not the *kind of harm* that the tax statutes primarily seek to prevent.  Rather, it alleged a kind of harm (competitive injury) that tax violations do not ordinarily cause and which ordinarily flows from the regular operation of a competitive marketplace.  Thus, in both *Holmes* and *Anza,* unlike the present case, plaintiffs alleged special harm, neither squarely within the class of harms at which the relevant statutes were directed, nor of a kind that typical violators would intend or even foresee.

*Bridge,* which the majority seeks to distinguish, *ante,* at 11–12, is a more closely analogous case.  The defendants in that case directed agents to misrepresent to a county that they qualified as independent bidders at a county-run property auction.  They consequently participated in the auction.  And the plaintiffs, facing additional bidders, lost some of the property that they otherwise would have won—all to their financial disadvantage.  553 U. S., at ___–___ (slip op., at 3–4).  The harm was foreseeable; it was intended; and it was precisely the kind of harm that the county's bidding rules sought to prevent.  Thus this Court held that the harm was "a foreseeable and natural consequence of [the defendants'] scheme."  *Id.,* at ___ (slip op., at 18).

In sum, the majority recognizes that "[p]roximate cause for RICO purposes . . . should be evaluated in light of its common law foundations," *ante*, at 6, but those foundations do not support the majority's view.  Moreover, the majority's rationale would free from RICO liability defen-

dants who would appear to fall within its intended scope. Consider, for example, a group of defendants who use a marketing firm (in RICO terms, an "enterprise") to perpetrate a variation on a "pump and dump" scheme. See, *e.g., United States* v. *Salmonese*, 352 F. 3d 608, 612 (CA2 2003). They deliberately and repeatedly make egregiously fraudulent misrepresentations to inflate the price of securities that, unbeknownst to investors, they own. After the stock price rises, the defendants sell at an artificial profit. When the fraud is revealed, the price crashes, to the investors' detriment. Suppose the defendants have intentionally spoken directly only to intermediaries who simply *repeated* the information to potential investors, and have not had any contact with the investors themselves. Under the majority's reasoning, these defendants apparently did not proximately cause the investors' losses and are not liable under RICO.

## III

If there is causation, we must decide whether, for RICO purposes, the City's loss of tax revenue is "'business or property' under 18 U. S. C. §1964(c)." *Ante,* at 5 (acknowledging, but not reaching, this second issue). The question has led to concern among the lower courts. Some fear that an affirmative answer would turn RICO into a tax collection statute, permitting States to bring RICO actions and recover treble damages for behavior that amounts to no more than a failure to pay taxes due. See, *e.g., Michigan, Dept. of Treasury, Revenue Div.* v. *Fawaz*, No. 86–1809, 1988 WL 44736, *2 (CA6 1988) (holding that tax revenue is not RICO "property" lest district courts become "collection agencies for unpaid state taxes"); *Illinois Dept. of Revenue* v. *Phillips*, 771 F. 2d 312, 316, 312 (CA7 1985) (holding, "reluctantly," that "a state's Department of Revenue may file suit in federal court for treble damages under [RICO] against a retailer who files fraudulent state

sales tax returns").

In a related context, however, the Department of Justice has taken steps to avoid the "tax collection agency" problem without reading all tax-related frauds out of similar federal criminal statutes. The Department's prosecution guidelines require prosecutors considering a tax-related mail fraud or wire fraud or bank fraud prosecution (or a related RICO prosecution) to obtain approval from high-level Department officials. And those guidelines specify that the Department will grant that approval only where there is at issue "a large fraud loss or a substantial pattern of conduct" and will not do so, absent "unusual circumstances," in cases involving simply "one person's tax liability." Dept. of Justice, United States Attorneys' Manual §6–4.210(A) (2007), online at http://www.justice. gov/usao/eousa/foia_reading_room/usam/title6/4mtax.htm (as visited Jan. 20, 2010, and available in Clerk of Court's case file); see also §6–4.210(B) (explaining that the Department "will not authorize the use of mail, wire or bank fraud charges to convert routine tax prosecutions into RICO . . . cases").

This case involves an extensive pattern of fraudulent conduct, large revenue losses, and many different unrelated potential taxpayers. The Department's guidelines would appear to authorize prosecution in these circumstances. And limiting my consideration to these circumstances, I would find that this RICO complaint asserts a valid harm to "business or property." I need not and do not express a view as to how or whether RICO's civil action provisions apply to simpler instances of individual tax liability.

This conclusion is virtually compelled by *Pasquantino* v. *United States*, 544 U. S. 349 (2005), a case that we decided only five years ago. We there pointed out that the right to uncollected taxes is an "entitlement to collect money . . . , the possession of which is 'something of value.'" *Id.,* at

355 (quoting *McNally* v. *United States*, 483 U. S. 350, 358 (1987)). Such an entitlement "has long been thought to be a species of property." 544 U. S., at 356 (citing 3 W. Blackstone, Commentaries on the Laws of England 153–155 (1768)). And "fraud at common law included a scheme to deprive a victim of his entitlement to money." 544 U. S., at 356. We observed that tax evasion "inflict[s] an economic injury no less than" the "embezzle[ment] [of] funds from the . . . treasury." *Ibid.* And we consequently held that "Canada's right to uncollected excise taxes on the liquor petitioners imported into Canada" is "'property'" within the terms of the mail fraud statute. *Id.,* at 355.

Hemi points in reply to our decision in *Hawaii* v. *Standard Oil Co. of Cal.*, 405 U. S. 251 (1972). But that case involved not a loss of tax revenues, but "injury to the general economy of a State"—insofar as it was threatened by violations of antitrust law. *Id.,* at 260. Hawaii's interest, both more general and derivative of harm to individual businesses, differs significantly from the particular tax loss at issue in *Pasquantino* and directly at issue here.

We have previously made clear that the compensable injury for RICO purposes is the harm caused by the predicate acts. See generally *Sedima, S. P. R. L.* v. *Imrex Co.,* 473 U. S. 479, 495–496 (1985); cf. *Cleveland* v. *United States*, 531 U. S. 12, 25 (2000). I can find no convincing reason in the context of this case to distinguish in the circumstances present here between "property" as used in the mail fraud statute and "property" as used in RICO. Hence, I would postpone for another day the question whether RICO covers instances where little more than the liability of an individual taxpayer is at issue. And I would find in the respondent's favor here.

With respect, I dissent.